DENZEL J. AND RUTH E. DOCKERY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; VORTEX INNERSPACE PRODUCTS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, RespondentDockery v. CommissionerDocket Nos. 14078-79, 14079-79.United States Tax CourtT.C. Memo 1982-509; 1982 Tax Ct. Memo LEXIS 234; 44 T.C.M. (CCH) 1044; T.C.M. (RIA) 82509; September 9, 1982. *234 Held: Amounts of reasonable compensation determined. David Laro, for the petitioners. F. Michael Kovach, Jr., for the respondent. WHITAKERMEMORANDUM OPINION WHITAKER, Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax as follows: TaxableAddition to TaxPetitionerYear EndedDeficiencyI.R.C. § 6653(a) 2Denzel J. & Ruth E.12-31-73$ 1,225.40Dockery12-31-7426,534.21Docket No. 14078-7912-31-7568,269.1112-31-7635,098.41Vortex Innerspace3-31-732,873.85$ 143.69Products, Inc.3-31-7446,868.122,343.41Docket No. 14079-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,586.603,079.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,929.263,146.46*235 Due to concessions by the parties, the only issues for decision are the deductibility of portions of the compensation (including pension and profit-sharing contributions) paid by Vortex Innerspace Products, Inc. (Vortex), to Mr. Dockery in each of its fiscal years ending March 31, 1974, 1975 and 1976 and its liability for additions to tax under section 6653(a) in each of its four fiscal years commencing with the year ending March 31, 1973. There is no dispute as to any issues remaining in docket No. 14078-79; however, if any of the amounts paid by Vortex to Mr. Dockery are determined not to be reasonable compensation, the income tax liability of Denzel J. Dockery and Ruth E. Dockery, husband and wife, for their calendar years 1973 through 1976, inclusive, will require a recalculation to reflect an adjustment in the amount of personal service income subject to the maximum rate under section 1348. Some of the facts have been stipulated and are so found. The parties have stipulated that when the petitions in these cases were filed Denzel J. Dockery and Ruth E. Dockery*236 resided in Ponce de Leon, Florida, and that Vortex was a Florida corporation with its principal office and place of business in Ponce de Leon, Florida. In approximately 1950, Dockery returned from military service to Flint, Michigan, where he resumed working for General Motors Corporation. He also from time to time took classes at General Motors Institute and to supplement his income accepted jobs as a diver. The latter ultimately led to the opening of a business to sell and repair scuba diving equipment and compressors, which business was incorporated in 1959 as Divers Supply, Inc. Divers Supply was and is wholly owned by Dockery. Dockery also commenced to develop his talents as an inventor, with his first commercially exploited patent being issued in 1969. One of his patented inventions was a filter for home aquariums called a diatom filter, which Divers Supply manufactured and sold. In 1971, Vortex was formed for the sole purpose of manufacturing and selling the filter in order to separate this business from the other business activities of Divers Supply. All of the stock of Vortex was and is owned by Dockery. During the years in issue, Dockery was the chief executive*237 officer and for all practical purposes the sole decision maker in Vortex, personally handling or supervising almost all aspects of its business. During all of this period, Dockery as a sole proprietorship continued in the business of purchasing, repairing and reselling Government surplus equipment. He also supervised the operation of Divers Supply, and in the early 1970's, he purchased some Florida property which he developed into a recreational area operated by Divers Supply. In 1975 he transferred his residence to Florida, while continuing to manage both Vortex and Divers Supply. Although Dockery had little formal education or business training, he successfully combined an inventive genius with the ability to exploit his patents. He worked hard and compensated himself well for his efforts. The following table 3 shows for Vortex for each of its fiscal years 1972 through 1976 the annual gross receipts, the Vortex net income prior to Dockery's compensation and income tax (for convenience, business income), the Vortex taxable income as reported, the direct compensation to Dockery, and the amount of compensation allowed as a deduction by respondent: *238 FY EndedFY EndedFY Ended3-31-723-31-733-31-74Annual Grossreceipts$537,531.65$864,673.44$1,097,580.96Business income103,087.45148,989.50214,065.58Taxable income35,920.7868,389.5063,953.52Direct compensationto Dockery67,166.6780,600.00150,112.06Compensationallowed asdeduction *88,660.06FY EndedFY Ended3-31-753-31-76Annual Grossreceipts$1,181,286.28$1,272,546.62Business income262,554.18223,895.89Taxable income88,386.076,115.91Direct compensationto Dockery174,168.11217,779.98Compensationallowed asdeduction *75,756.00107,268.98According to Dockery's testimony, he fixed his own compensation each year based essentially on the financial results of Vortex for that and the prior year. We note that during this five-year period, gross receipts increased approximately 237 percent, with the largest annual increase occurring in FY 1973. Corporate income prior to Dockery's compensation*239 and taxes doubled, while Dockery's compensation tripled over his five-year period. Looking at only the four years before us, gross receipts increased 152 percent, whereas Dockery's compensation increased 269 percent. The comparison of the 1975 and 1976 fiscal years is also instructive. Gross receipts increased 8 percent, total income increased 6 percent, net income prior to Dockery's compensation and taxes decreased 15 percent and net income almost vanished. However, Dockery's compensation increased 25 percent. We also note from the FY 1976 income tax return that loans from stockholders, i.e., from Dockery, increased from $1,000 at the beginning of the year to almost $69,000 at the end of the year. The 1976 fiscal year's results seem to belie Dockery's testimony that his compnsation took into account the current year's operations. It is at least questionable whether an arm's-length standard would recognize as proper a 25 percent increase in the principal officer's salary in a year when income excluding that salary decreased 15 percent and the corporation was required to borrow back from the officer two-thirds of the increase in that officer's compensation. The reasonableness*240 of compensation is a question of fact to be determined from all of the facts and circumstances. , affg. a Memorandum Opinion of this Court; , affd. . While no single factor is decisive, one of the tests customarily considered is the prevailing rate of compensation for comparable positions in comparable concerns. , revg. a Memorandum Opinion of this Court. Both parties in this case offered testimony of comparable salaries based on surveys. One of trhe surveys showed that salaries for chief executive officers of Michigan-based companies with roughly the same gross receipts as Vortex ranged up to $150,000, with the mean being $79,000 in 1976. Another survey based on 1980 data showed that both in Michigan and the nation as a whole only one in four chief executive officers of companies of similar size was making over $100,000. In addition, petitioner's witness expressed his*241 opinion as to he reasonableness of Dockery's compensation. Petitioner's witness testified that in his opinion Dockery was undercompensated in the early years and that his compensation was at least reasonable in the later years. This opinion was based at least in part on the witness' survey of a large number of corporations with 50 or fewer employees and by aggregating the compensation paid by the reporting companies to four to six corporate employees who individually were reported as performing together the services which Dockery himself performed. We view this conclusion as totally unrealistic. There was no testimony from this witness or otherwise that in the real world the salary of an executive officer in an arms's-length situation will increase more or less directly in proportion to the number of corporate functions which that individual undertakes to perform. While , does recognize that "the nature, extent and scope of the employee's work * * *" is one of the factors to be taken into account, we are not persuaded that the approach taken by petitioner's witness could be factually supported. Certainly, this*242 record does not support that conclusion. We do not agree that a comparable compensation level can be established by aggregating the salaries of four to six corporate officers who collectively perform the same functions as the employee whose compensation is in issue. This is especially true where the employee being tested had substantial outside activities, as petitioner did here. Petitioner sought to qualify his witness as an expert on executive compensation matters. The witness testified that he had consulted with corporate employees with respect to salary ranges for many years, but we conclude that in the compensation area this witness' expertise is largely based upon his experience with statistical samples. His testimony was not convincing, either as an expert or as a statistician. Petitioner argues that Dockery was not compensated for the use by Vortex of his diatom filter patent, that a reasonable royalty would have been 8 percent of sales revenue from the filter and that this item alone would justify compensation approximating $100,000 per year. This theory is supported, according to the argument, by a prior Memorandum Decision 4 of this Court. However, petitioner's*243 argument fails to take into account the per unit payment made by Vortex, explained below, one-half of which was channeled to Dockery. Ownership of the diatom filter patent was retained by Dockery. No written royalty agreement was entered into either with Divers Supply or Vortex. Prior to 1971 Divers Supply paid Dockery the sum of $1 for each filter unit sold, apparently as an informal royalty payment. When the business was transferred to Vortex, Dockery caused Vortex to pay to Divers Supply $2 per unit, $1 remaining with Divers Supply and the other $1 being passed on to Dockery.5 The record is not entirely clear as to the annual amounts of this payment, but we note that Dockery on his 1976 calendar year income tax return reported commissions from Divers Supply in the amount of $45,251. For the prior year, such commissions were almost $42,000. In the calendar years 1973 and 1974, he reported royalty income from Divers Supply of approximately $44,000 and $54,000, respectively. On the basis*244 of the whole record, we conclude that these sums reflect the informal royalty of $1 per unit, which Vortex indirectly paid Dockery for use of the diatom filter patent. Whether or not a larger royalty payment might have been justified as speculative. This amount was fixed by Dockery well prior to the years in issue and we are entitled to presume that he believed that amount was reasonable under the circumstances. We conclude that no part of Dockery's direct compensation from Vortex can be justified as in lieu of patent royalties or as a payment for services as an inventor. In fact, petitioner denied that his employment obligation to Vortex included any time and effort expended in working on inventions. *245 As we have already noted, Dockery combined the attributes of an unusually successful businessman with those of an inventor, and his worth to Vortex may well have been greater than that of the average chief executive officer to the average corporation similarly situated in the Michigan area. On the other hand, we must take into account the fact, which we have noted already, that Dockery did not work for Vortex as an inventor and was being compensated by Vortex for its use of his major invention through the per unit commission paid to Divers Supply in a substantial sum. We also note that Vortex never paid dividends. 6 Petitioner, from his testimony, appears to have felt that he was worth whatever compensation he could withdraw from Vortex. While that approach is understandable, the Code establishes a different standard. 7 We find no adequate basis on this record for concluding that any company similarly situated would have paid Dockery a larger salary in FY 1972 and FY 1973 than Vortex actually paid. 8 Thus we do not consider that the compensation paid in the next three years can be justified in part as compensation for services in prior years. *246 We find that for the fiscal years ending in 1974, 1975 and 1976, a salary of $75,000 to $80,000 per year would be considered a mean or average salary for a chief executive officer of a similarly situated company. We conclude that Dockery was entitled to some premium above that but we consider that premium to be reflected in part by the royalty or commission payments to Divers Supply which were passed on to him. Nor can we ignore the fact that Dockery had substantial activities and business interests outside Vortex. While he testified that 100 percent of his time went to Vortex, we cannot accept that testimony literally, in view of other testimony in the record, including in particular his own testimony. We note, too, that petitioner's economic compensation also included his interest in the pension and deferred profit-sharing plans of Vortex. , describes the factors to be taken into account in the following language: * * * the employee's qualifications; the nature, extent and scope of the employee's work; the size salaries paid with the gross income and the net income; the prevailing general economic*247 conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. * * * The situation must be considered as a whole with no single factor decisive. Taking all the factors into account, as they apply in this case, we conclude that reasonable compensation for Dockery for the fiscal years here in issue would be as follows: FYCompensation1974$100,0001975125,0001976125,000In addition, we would consider to be reasonable the maximum deferred compensation which can be allocated to Dockery under the pension and profit-sharing plans for each of these years. Respondent in his initial brief questioned whether or not the record supports actual payment by Vortex to Dockery of the compensation claimed in the returns for the fiscal years 1975 and 1976. This issue came to light in connection with the supplemental stipulation prepared at the Court's request after the trial. *248 While the burden of proof in this case rests on petitioner (Rule 142 of the Rules of Practice and Procedure of this Court), that extends only to the issues raised in the statutory notice and the pleadings. A petitioner cannot be expected to present proof of every item in a tax return, especially where respondent has chosen to contest only a relatively narrow question. . We must assume that respondent's agents, in the course of considering whether the amounts paid to Dockery were deductible in full or only in part verified actual payment to the extent required. The fact that the record may not now be sufficiently complete to verify the payments does not necessarily show that the amounts were not paid or impose on petitioner a burden of proof with respect thereto. In his reply brief respondent abandons this as a new issue, but instead argues that it is further evidence of negligence in record keeping, supporting respondent's assertion of additions to tax under section 6653(a) for each year. While this issue is a close one, we find the testimony of petitioner's independent certified public*249 accountant to be convincing. Certainly, petitioner's record keeping was not as accurate and precise as it should have been, but we find that the negligence penalty should not be applied in this case. Accordingly, we hold against respondent on the section 6653(a) addition to tax issue. Decision will be entered under Rule 155.Footnotes2. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended.↩3. The information for this table is derived in large measure from joint exhibit 39-AM. However, the gross receipts figure for FY 1976 in that exhibit appears to be incorrect and the remaining gross receipts figures are not consistent with tax returns, some taking into account returns and allowances. Briefs of the parties are also inconsistent. We have, therefore, used for convenience and consistency the gross receipts figure in column 1 of Vortex's income tax returns, exhibits 14-N, 15-O, 16-P, 17-Q and 18-R, which figures respondent did not adjust in the statutory notice.↩*. The above table does not include as compensation the amounts of deferred compensation allocated to Dockery or amounts paid to him as royalties or commissions.↩4. . Respondent argues the contrary, based on .↩5. Dockery explained this payment in testimony as compensation to Divers Supply for loss of an ongoing valuable business and as compensation to him for his selling efforts which benefited Divers Supply. On some of the tax returns, Dockery's $1 is characterized as a royalty and on others as a commission. In view of his ownership of both corporations, such characterizations or explanations carry little weight. It seems difficult for Vortex to justify paying Divers Supply a commission for Dockery's efforts as a full-time employee of Vortex. A more reasonable explanation would be that Vortex assumed, as part of the $2 item, Divers Supply's obligation to pay Dockery a $1 royalty.↩6. This is a factor indicating that the ever increasing amounts of compensation were unreasonable. See , affg. a Memorandum Opinion of this Court; . ↩7. Section 162(a)(1) allows a deduction for "a reasonable allowance for salaries or other compensation for personal services actually rendered." ↩8. The testimony of petitioner's witness, Bradford W. Ketchum, Jr., to this effect was simply not convincing.↩