RICHLANDS MEDICAL ASSOCIATION, Petitioner v COMMISSIONER OF INTERNAL REVENUE, Respondent
Richlands Medical Ass'n v. Comm'r
Docket No. 16595-86
United States Tax Court
T.C. Memo 1990-660; 1990 Tax Ct. Memo LEXIS 735; 60 T.C.M. (CCH) 1572; T.C.M. (RIA) 90660; December 31, 1990, Filed Decisions will be entered under Rule 155. R. David Barbe and Joseph Anthony, for the petitioner. Scott Anderson, for the respondent. WELLS, Judge. WELLS
*2232 Respondent determined deficiencies in petitioner's Federal income tax as follows: Taxable Year
[1] Additions to Tax Under Section Ended
Deficiency
6653(a)(1)
6653(a)(2)
10/31/82
$ 637,376.44
$ 31,868.82
*
10/31/83
602,206.61
30,110.33
*
The issues to be decided are: (1) whether petitioner is taxable as a corporation or as a partnership; (2) the amount of compensation to be allowed as a deduction to petitioner for payments to its owner-employees; and (3) whether petitioner is liable for additions to tax under sections 6653(a)(1) and (2). FINDINGS OF FACT General Background and Entity Classification
Some of the facts are stipulated and are found accordingly. The stipulations and attached exhibits are incorporated herein *736 by reference. At the time the petition in the instant case was filed, Richlands Medical Association was a professional association under the laws of the State of Virginia with its principal place of business in Richlands, Virginia. In 1917, the Mattie Williams Hospital (the Hospital) began operations in Richlands, Virginia. The Hospital was owned by Dr. W. R. Williams until his death in 1961, at which time ownership passed to Dr. Williams' heirs (some or all of whom are referred to herein as "the Williams heirs"). The Hospital was a relatively small facility, containing 76 beds, and was located in a rural, mountainous area. The predominant business activity in the area of the Hospital was coal mining. The services provided by the Hospital included emergency room service, electrocardiography, sonography, radiology, obstetrics, surgery, intensive care, and pediatrics. During 1962, Richlands Medical Association (petitioner) was organized pursuant to the Professional Association Act of Virginia, section 54-873 et seq., Code of Virginia (the Virginia Act), [2] for purposes including the practice of medicine and the operation of a general hospital. In accordance with the Virginia Act, *737 articles of association were adopted for petitioner. Between 1962 and 1964, petitioner operated the Hospital without a written lease from the Williams heirs. Between 1964 and 1986, petitioner operated the Hospital pursuant to a series of written lease agreements and a financing agreement entered into with the Williams heirs. On October 26, 1981, petitioner's articles of association were amended. The amended articles of association (Articles) remained in effect throughout the years in issue, in addition to bylaws (Bylaws) governing the affairs of petitioner. The owners, or "members," of a professional association organized under the Virginia Act are referred to as its "associates," and each associate is entitled to a "certificate of ownership" evidencing the proportional part of the association owned by him. Virginia Act sections *2233 54-874(1), 54-888. The Virginia Act also provides that all associates of a professional association must be employees of the association and must be licensed to practice the profession for which the association is organized. Virginia Act sections 54-885, 54-888, 54-890. Petitioner's Articles listed *738 its associates as Doctors James H. McVey, William R. Strader, Ernest E. Moore, and Emile I. Khuri and listed those same individuals as petitioner's initial Board of Directors. Dr. Strader died during petitioner's taxable year ended October 31, 1982. Pursuant to the authority of section 54-889 of the Virginia Act, upon the death of one of petitioner's associates, the associate's certificate of ownership was to be returned to petitioner. Starting in mid-1982 and continuing for the remainder of the taxable years in issue, Doctors McVey, Moore, and Khuri were the sole associates of petitioner and were also the sole members of its Board of Directors. [3] *739 On various occasions, they were required to guarantee or endorse loans (including a line of credit) obtained by petitioner. Under the Virginia Act, the board of directors of a professional association must be composed of at least three persons. Virginia Act section 54-882. The Bylaws provided that petitioner's Board of Directors could consist of between three and seven persons. [4] Vacancies in the Board of Directors were to be filled by the Board of Directors, and the person elected to fill a vacancy would hold office until the next annual meeting of the associates at which directors were to be selected. A majority of the Directors in office were necessary to constitute a quorum for the transaction of business, and any question before the Board was to be determined by majority vote. Moreover, *740 the Board could, by two-thirds vote, expel an associate. The Bylaws provided that petitioner's Board of Directors could hold its meetings at such times and places as it might designate, but was required to hold at least one meeting per quarter. During the taxable years in issue, petitioner's Board of Directors held at least 26 meetings, the minutes of which were recorded by petitioner's Executive Secretary pursuant to responsibilities outlined in the Bylaws. At those meetings, a variety of matters relating to the operation of the Hospital were discussed and voted upon, including: hiring decisions with respect to nonowner physicians, collections, pay raises and other personnel matters, purchases and leases of property, pension matters, litigation involving petitioner, and retention of accountants. The meetings sometimes were called on very short notice, depending on the urgency of the matters requiring attention. The Bylaws provided *741 for the employment of a Hospital administrator who was to act as the representative of the Board of Directors in the management of the Hospital. The hospital administrator, however, was required to obtain approval from the Board of Directors for all expenditures not necessary to the everyday operation of the Hospital in excess of $ 1,000. During the taxable years in issue, petitioner leased the Hospital from the Williams heirs under a seven year lease (the lease) commencing November 1, 1976, and ending October 31, 1983, for a monthly rental of $ 10,000. The lease provided that any fixtures, furniture, equipment or instruments purchased by petitioner, as well as any outstanding accounts receivable of petitioner, would become the property of the Williams heirs upon termination of the lease. The lease also provided that it would automatically terminate if, for any reason, petitioner had less than three members. The lease was signed by the President of petitioner solely on behalf of petitioner. On November 1, 1977, petitioner, its associates, and the Williams heirs entered into an amendment to the lease and a financing agreement. The financing agreement provided that petitioner would *742 be the maker of a note (the note), to be endorsed by petitioner's associates, evidencing a loan of up to $ 800,000, which amount was needed to finance construction necessary to maintain licensure and accreditation for the Hospital under standards prescribed by the Virginia State Health Department. Additionally, the Financing Agreement provided that the lease would be extended for a term coincident with the term of the note, and that a person mutually acceptable to the Williams heirs and to petitioner would serve as petitioner's Hospital administrator. On February 18, 1978, the note, in the amount of $ 800,000 payable in eight annual *2234 installments, was executed by petitioner and endorsed by its associates, who assumed joint and several liability on the note. Because the last installment of the note was due on October 15, 1986, the lease was extended until that date. No further extensions of the lease occurred subsequent to October 1986, and petitioner ceased operations in December 1986. Petitioner's Articles provided that "the duration of the association is to be perpetual." Petitioner consistently filed its Federal income tax returns as a corporation on Form 1120. Reasonable *743 Compensation
During the years in issue, petitioner paid its associates the following amounts, and deducted such amounts as compensation of officers (Schedule E, Form 1120): [5]
Year Ended
Year Ended
Associate
10/31/82
10/31/83
Dr. James McVey
$ 977,778
$ 873,298
Dr. Emile Khuri
702,524
672,871
Dr. Ernest Moore
566,552
523,831
Respondent, in his notice of deficiency, allowed as a compensation deduction with respect to each associate an amount equal to 100 percent of the "collections" recorded by petitioner as attributable to medical services performed directly for patients by such associate. The following chart illustrates the amount of such "collections" allowed by respondent, in addition to the amounts recorded by petitioner as "billed" for the medical services of each associate during the years in issue: [6]
Year Ended 10/31/82
Year Ended 10/31/83
Associate
Billings
Collections
Billings
Collections
Dr. James McVey
$ 622,260.36
$ 397.556.12
$ 592,470.60
$ 324,759.38
Dr. Emile Khuri
363,641.51
241,014.39
426,434.13
231,435.84
Dr. Ernest Moore
310,204.46
191,713.62
302,641.13
162,467.94
*744 A comparison of the compensation paid to each associate with "billings" and "collections" indicates that each associate was paid, during the years in issue, not only substantially more than the collections recorded for his services but also substantially more than the billings for his services. For example, Dr. McVey's pay for the year ended 10/31/82 was approximately 157 percent of his billings and 246 percent of his collections; Dr. Khuri's pay for such year was approximately 193 percent of billings and 291 percent of collections. Dr. McVey received his medical degree from the University of Virginia in 1957 an began his practice at the Hospital in 1958. His specialty was family medicine. On a daily basis, Monday through Friday, Dr. McVey saw an average of approximately 60 outpatients; on Saturdays, he saw an average *745 of 30-40 outpatients. Additionally, Dr. McVey saw approximately 40 inpatients on a daily basis. Dr. Khuri received his medical degree from the American University of Beruit in 1968. He began his practice in 1974 after completing four years of general surgery residency in Lebanon and two years of thoracic surgery residency at the University of California at Irvine. Dr. Khuri, who served as petitioner's President during the years in issue, worked at the Hospital about 55-60 hours per week in addition to hours "on call." He saw an average of approximately 25 outpatients and 7-8 inpatients per day at the Hospital. There were no employment contracts fixing the renumeration of petitioner's associates. The Bylaws, however, provided that: The Board of Directors at the end of the fiscal year shall divide the net profits in the following manner: 25.0% of the profits shall be divided equally among the associates, and the remaining 75.0% shall be divided according to each associate's productivity factor. The factor being his total net collections. The denominator being the total net collections of all associates.
As among the three associates, Doctors McVey, Khuri, and Moore, relative compensation *746 during the years in issue was roughly proportional to relative collections, as illustrated in the following chart: *2235 Individual's Compen-
sation as Individual's Collections
Percentage of Total as Percentage of Total
Associate of Associate *
Associate Collections
Compensation Year Ended 10/31/82
Dr. McVey
48%
44%
Dr. Khuri
29%
31%
Dr. Moore
23%
25%
Year Ended 10/31/83
Dr. McVey
45%
42%
Dr. Khuri
32%
33%
Dr. Moore
23%
25%
During the years in issue, petitioner employed other physicians, in addition to its associates, to work in the Hospital. There were eight of such nonowner physicians employed at the Hospital during the year ended 10/31/82, and ten of such physicians during the year ended 10/31/83. The nonowner physicians employed at the Hospital entered into written employment contracts with petitioner. The employment contracts submitted into evidence herein indicate that such physicians generally were paid on the basis of a fixed salary or a percentage of annual collections, whichever was greater, with such percentages ranging from 85 percent of 110 percent of collections. *747 Neither petitioner's associates nor the other physicians employed by petitioner paid rent for the use of Hospital facilities and equipment or paid the other expenses (such as nurses salaries) associated with private practices. When a patient was treated at the Hospital, the Hospital issued a single bill which included charges for physician's professional services (the physician component) and for other Hospital services and items (the Hospital component). Included within the Hospital component of the bill were charges for "ancillary services" such as anesthesia, operating room, recovery room, drugs, x rays, etc. In the event that a bill was not paid in full and the payor failed to designate whether his payment was to be applied to the physician or Hospital component (nondesignated partial payments), petitioner's practice was to treat the payment as attributable to the Hospital component up to the amount of such Hospital charges. Nondesignated partial payments sometimes occurred in the case of payments by certain private insurance companies. With respect to payments received from Blue Cross/Blue Shield, all amounts from Blue Shield were allocated to physician services, and all *748 amounts from Blue Cross were allocated to the Hospital component of a bill. Similarly, all payments from Medicaid, Medicare, and other Government insurance programs were designated as attributable to either physician or Hospital services. Petitioner's practice of allocating nondesignated partial payments to Hospital charges had the effect of reducing the "collections" recorded for its physicians. As noted above, petitioner's nonowner physicians were generally compensated based on a fixed salary or percentage of such "collections," whichever was greater. For the taxable year ended 10/31/82, petitioner's highest-paid nonowner physician received a salary of $ 146,574.00; for the taxable year ended 10/31/83, such salary was $ 214,011.90. Mr. James L. Davis, who previously had been a co-administrator of the Hospital, became the full-time Hospital administrator in February 1982. As administrator, Mr. Davis was paid $ 86,863 for the taxable year ended 10/31/82 and $ 95,536 for the taxable year ended 10/31/83. The Bylaws required the Hospital administrator to attend all meetings of petitioner's board of directors and outlined his duties, including (1) supervision of all business affairs *749 of the Hospital such as records of financial transaction, collection of accounts, and purchase and issuance of supplies and drugs, (2) submission of monthly reports to the board of directors showing the professional service and financial activities of the Hospital, (3) annual submission to the board of directors of a plan of organization of personnel and others concerned with Hospital operation, (4) serving as a liaison between petitioner's board of directors and the Hospital's medical staff, (5) enforcing all rules and regulations for the conduct of the Hospital made by and under the authority of the Board of Directors, and (6) responsibility for overseeing the physical condition and repair of Hospital properties. The compensation received by petitioner's associates during the years in issue substantially exceeded amounts received in prior years. While petitioner's gross income also increased over the same period, the increases in gross income were relatively small in comparison with the *2236 increases in compensation. The following chart illustrates the increases in petitioner's gross income during a six-year period ending with the years in issue. Petitioner's
Year Ended
Gross Income
(Form 1120, line 11)
10/31/78
$4,642,842 10/31/79
5,323,688
10/31/80
6,378,191
10/31/81
7,378,715
10/31/82
9,951,916
10/31/83
10,308,289
The *750 chart below illustrates the increases in compensation and "collections" of Drs. McVey, Khuri and Moore during the same six-year period. As indicated in the chart, the increases in compensation which occurred starting with the years in issue were also high in relation to increases in "collections." [7]
Taxable Dr. McVey
Dr. Khuri
Year Ended
Collections
Compensation
Collections
Compensation
10/31/78
$ 249,254
$ 378,000
$ 101,600
$ 95,000
10/31/79
281,084
273,408
159,223
192,383
10/31/80
313,019
345,870
240,742
285,828
10/31/81
308,121
397,714
181,838
261,450
10/31/82
397,556
977,778
241,014
702,524
10/31/83
324,759
873,298
231,436
672,871
Taxable Dr. Moore
Year Ended
Collections
Compensation
10/31/78
$ 76,311
$ 127,042
10/31/79
95,318
124,274
10/31/80
150,218
198,530
10/31/81
150,822
228,244
10/31/82
191,714
566,552
10/31/83
162,468
523,831
Thus, *751 between the years ended 10/31/78 and 10/31/81, Dr. McVey's compensation averaged approximately 121 percent of his collections. For the years in issue, however, Dr. McVey's compensation averaged approximately 256 percent of his collections. Similarly, Dr. Moore's compensation for the years ended 10/31/78 through 10/31/81 averaged approximately 143 percent of his collections while his compensation for the years in issue averaged approximately 308 percent of collections. During the years in issue, section 54-885 of the Virginia Act conveyed upon the board of directors of a professional association the right to fix the amount and method of compensation of association employees as well as the right "to set up reserves or distribute excess earnings to each of the associates in proportion to his ownership in the association." Petitioner's Bylaws provided for the distribution to its associates of all of petitioner's "net profits" each year. Petitioner treated all payments to its associates as compensation, and did not treat any of such payments as dividends. OPINION Classification of Petitioner - Corporation or Partnership?
Background
In its amended petition, petitioner claims that, notwithstanding *752 its consistent reporting of income and deductions as a corporation, it properly was taxable as a partnership because it lacked the corporate attributes of continuity of life, centralization of management, limited liability, and free transferability of interests. In considering petitioner's claim to partnership status, [8] a brief history of the classification of professional entities is useful to set the stage. The tax status of state-chartered professional associations and professional corporations is an issue which received widespread attention from courts as well as commentators during *753 the 1960's, at which time the Treasury's litigating posture was to argue against corporate status for such entities. See Bittker, "Professional Service Organizations: A Critique of the Literature," 23 Tax L. Rev. 429 (1968) (noting that the classification of professional groups "has been the subject of a vast polemical literature"); Eaton, "Professional Corporations and Associations in Perspective," 23 Tax L. Rev. 1 (1967); Bittker, "Professional Service Organizations: A Comment," 24 Tax L. Rev. 291 (1969); "Professional Service Organizations: A Reply," 24 Tax L. Rev. 300 (1969); B. Eaton, 17 Business Organizations, Professional Corporations and Associations, chs. 4-5 and 26-31 (1990) (hereinafter referred to as Eaton). The case often credited with igniting the controversy which occurred during the 1960's is United States v. Kintner, 216 F.2d z418 (9th *2237 Cir. 1954). In that case, the Ninth Circuit upheld the taxpayer's claim that a Montana medical group (which had adopted a pension plan) should be taxed as a corporation rather than as a partnership. Such claim was sustained by the court notwithstanding the fact that corporations could not practice medicine in Montana and that the *754 entity was "probably" a partnership under Montana's Uniform Partnership Act. 216 F.2d 421, 425-426. Presumably concerned over the increasing adoption of qualified plans by professionals, Treasury attempted to overturn the result in Kintner by adopting the "Kintner Regulations" in 1960. See Larson v. Commissioner, 66 T.C. 159, 187 (1976) (J. Dawson, concurring); Zuckman v. United States, 207 Ct. Cl. 712, 524 F.2d 729, 733-734 (1975); Horsley, "The Virginia Professional Association Act: Relief for the Underprivileged?," 48 Va. L. Rev. 777, 786-7 (1962); Eaton, supra at 5-5 - 5-6. The Kintner Regulations, which provided that an entity had to possess "more" corporate than noncorporate characteristics to be taxed as a corporation, remained in effect, without substantial change, during the years in issue and form the crux of the parties' dispute herein. The Kintner Regulations contain the statement that: Although it is the Internal Revenue Code rather than local law which establishes the tests or standards which will be applied in determining the classification in which an organization belongs, local law governs in determining whether the legal relationships which have been established *755 in the formation of an organization are such that the standards are met. Thus, it is local law which must be applied in determining such matters as the legal relationships of the members of the organization among themselves and with the public at large, and the interests of the members of the organization in its assets. [Section 301.7701-1(c), Proced. and Admin. Regs.] Viewing the Treasury's focus on the role of local law as "an invitation," numerous states passed "enabling" acts during the early 1960's aimed at allowing professional groups to attain corporate status for Federal income tax purposes. See Eaton, supra at p. 5-11. The Act under which petitioner was organized was one of about 30 such statutes passed between 1960 and 1963. See Horsley, supra at 790-791; Eaton, supra at p. 5-11 ("by Labor Day 1969 the count had reached forty-seven"). In 1965, Treasury responded to the wave of state enabling acts by issuing amendments to the Kintner Regulations (referred to herein as "the 1965 Regulations") "designed to thwart the efficacy of state professional association acts to confer corporate status under the Kintner regulations." Kurzner v. United States, 413 F.2d 97, 109 (5th Cir. 1969). *756 The 1965 Regulations, which were contained primarily in former section 301.7701-2(h), Proced. and Admin. Regs. (entitled "classification of professional service organizations"), established criteria for classifying professional service organizations as corporations which clearly were different than the standards applied to all other entities and which effectively would deny corporate status to virtually all professional service entities. [9] *757 The courts uniformly found that the 1965 Regulations were arbitrary, discriminatory, and an unauthorized attempt to legislate, and therefore held such regulations invalid. See, e.g., Kurzner v. United States, 413 F.2d 97 (5th Cir. 1969); Holder v. United States, 289 F. Supp. 160 (N.D. Ga. 1968), affd. per curiam 412 F.2d 1189 (5th Cir. 1969); O'Neill v. United States, 410 F.2d 888 (6th Cir. 1969) (regulation held invalid only to extent it denied corporate status for Federal income tax purposes to an entity chartered as a corporation under state law); United States v. Empey, 406 F.2d 157 (10th Cir. 1969). For a compilation of the cases invalidating the 1965 regulations, see Eaton, supra, Chapter 30. In Revenue Ruling 70-101, 1970-1 C.B. 278, the Internal Revenue Service announced that it would no longer seek to deny corporate status to professional entities organized under various state statutes. The ruling stated: In light of recent decisions of the Federal courts, the Service generally will treat organizations of doctors, lawyers and other professional people organized under state professional association acts as *758 corporations for tax purposes. [10]
Included in the list of state professional association acts contained in Revenue Ruling 70-101 was the Virginia Act under which petitioner was organized. The Virginia Act defines a "professional *2238 association" as an "unincorporated association, as distinguished from a partnership or a corporation," organized for the purpose of carrying on one of several designated professions, but provides that professional associations shall be taxable as corporations for income tax purposes. Sections 54-874(3), 54-897, Virginia Act. In addressing the classification issue herein, a number of cases holding the 1965 Regulations invalid are relevant in that those cases also held the organizations in question to be corporations under the Kintner Regulations. (As noted above, the Kintner Regulations remained in effect without any substantial change *759 during the taxable years in issue, the 1965 Regulations having been revoked by such time). [11] The instant case, therefore, is unique with respect to the posture in which the parties find themselves. The reversal of the traditional roles of the parties with respect to the issue, however, in no way requires us to apply different legal principles. Segel v. Commissioner, 89 T.C. 816, 826 (1987). Analysis of Classification Factors
The parties are in agreement that the factors contained in the Kintner Regulations [12] (relevant portions of which are set forth in Appendix I to this opinion) are determinative of the classification issue presented in the instant case. As we stated in Larson v. Commissioner, 66 T.C. 159, 172 (1976), "our opinion and decision are consequently framed in that context; the validity of [the] regulations is not before us." *760 We therefore express no opinion as to the validity or invalidity of the regulations. The Kintner Regulations (hereinafter sometimes referred to as the regulations) set forth six characteristics ordinarily found in a corporation which distinguish it from other organizations. Those characteristics are (1) associates, (2) an objective to carry on business and divide the gains therefrom, (3) continuity of life, (4) centralization of management, (5) limited liability, and (6) free transferability of interests. The regulations go on to note that, in some cases, other factors may be found which may be significant in classifying an organization. In deciding whether an organization properly is classified as a partnership, as opposed to a corporation, the first two characteristics listed above -- associates and an objective to carry on business and divide the gains therefrom -- are ignored, since those characteristics are common to both entities. The relevant determination thus turns on the existence of continuity of life, centralization of management, limited liability, and free transferability of interests with respect to the entity. *761 Section 301.7701-2(a)(2), Proced. and Admin. Regs. Although the regulations cite the Supreme Court decision in Morrissey v. Commissioner, 296 U.S. 344 (1935), for the proposition that corporate status will exist if an organization "more nearly resembles" a corporation than a partnership or trust, the regulations adopt a mechanical test for determination of corporate status. Under that test, each of the four characteristics "apparently bears equal weight in the final balancing," Larson v. Commissioner, supra at 172, and an entity will not be taxed as a corporation unless it possesses more corporate than noncorporate characteristics. Section 301.7701-2(a)(3), Proced. and Admin. Regs.; Larson v. Commissioner, supra at 185. [13] We now turn to a consideration of those characteristics.[14] *762 1. Continuity of Life
Pertinent provisions of section 301.7701-2(b), Proced. and Admin. Regs., concerning continuity of life, are set forth in the Appendix. Section 54-887 of the Virginia Act, under which petitioner was organized, [15] *764 apparently is aimed at allowing professional associations to *2239 possess the characteristic of continuity of life. [16] The provision states: Duration of association. Unless the articles of association expressly provide otherwise, a professional association shall continue as a separate entity, independent of its associates, for all purposes and for such period of time as is provided in the articles of association, or until dissolved by a vote of two-thirds of the associates, and shall continue notwithstanding the death, insanity, incompetency, resignation, withdrawal, transfer of membership or of interest, retirement, or expulsion of any one or more of the associates, the admission of or transfer *763 of membership or interest to any new member or members, or the happening of any other event which under the laws of this State and under like circumstances, would cause a dissolution of a partnership, it being the purpose and intent of this section that such professional association shall have continuity of life independent of the life or status of its associates. No associate shall have the power to dissolve the association by his independent act of any kind. [Emphasis supplied.] Section 54-887 of the Virginia Act mirrors the regulations' requirements with respect to events that will not trigger dissolution of the organization. While section 54-887 of the Virginia Act, at first glance, does not *765 provide for continuity in the event of a member's bankruptcy specifically, such event is included within the clause which provides for continuity notwithstanding "any other event which under the laws of this State and under like circumstances, would cause a dissolution of a partnership." See Code of Virginia, section 50-31(5) (providing that partnership dissolution is caused by the bankruptcy of any partner). Moreover, although the Virginia Act allows a professional association's articles of association to provide "otherwise," petitioner's Articles expressly state that "The duration of the association is to be perpetual." Finally, the Virginia Act denies associates the independent power to dissolve the association, which power would, under the regulations, [17] defeat continuity of life. See also Virginia Act section 54-894 (dissolution of association requires two-thirds vote by associates). Notwithstanding the fact that the Virginia Act in conjunction with petitioner's Articles would cause petitioner to possess continuity of life, petitioner states on brief that continuity of life is "arguably" absent in the instant case because "the *766 primary purpose of [petitioner] was to operate a hospital; and, upon termination of the existing lease, the entity could not operate a hospital without a Certificate of Public Need." Such argument is without merit. As we stated in Larson v. Commissioner, supra at 175,
the regulations are so clearly keyed to "dissolution" (a term encompassing * * * legal relationships * * *) rather than "termination of the business" (a phrase capable of more pragmatic interpretation encompassing the life of the business enterprise) * * * See section 301.7701-2(b)(2), Proced. and Admin. Regs. ("there may be a dissolution of the organization and no continuity of life although the business is continued by the remaining members"); Kurzner v. Commissioner, 413 F.2d 97, 103 (5th Cir. 1969) ("continuity of the enterprise is as much a characteristic of a partnership as of a corporation -- i.e., on the level of feasibility"); O'Neill v. United States, 410 F.2d 888 (6th Cir. 1969). [18] *767 Petitioner's argument also fails to take into account the fact that petitioner's Articles provided for business "purposes" broader than the operation of a hospital. The argument further assumes that an entity with a limited life automatically lacks continuity of life under the regulations. That is not the case; the regulations provide that if an organization is to continue for a stated period or until the completion of a stated transaction, the organization has continuity of life if the effect of the agreement establishing the organization *768 is that no member has the power to dissolve the organization in contravention of the agreement. Section *2240 301.7701-2(b)(3), Proced. and Admin. Regs; Outlaw v. United States, 204 Ct. Cl. 152, 494 F.2d 1376, 1382 (1974); Hynes v. Commissioner, 74 T.C. 1266, 1282 (1980). Accordingly, we hold that petitioner possessed the characteristic of continuity of life. 2. Centralization of Management
Pertinent provisions of section 301.7701-2(c), Proced. and Admin. Regs., concerning centralization of management, are set forth in Appendix I. Virginia Act section 54-882 is an apparent effort to confer centralized management upon Virginia professional associations and provides in relevant part: Board of directors. A professional association organized pursuant to the provisions of this chapter shall be governed by a board of directors, which shall have the full management of the business and affairs of the association and continuing exclusive authority to make management decisions on its behalf, and no associate shall have the power to bind the association within the scope of its business or profession merely by virtue of his being an associate. * * * During the taxable years in issue, petitioner's *769 Bylaws likewise provided that "The affairs of this association shall be under the management of its Board of Directors and such officers and agents as said Board may elect to employ, and that Board of Directors acts as a Committee as a whole." At first blush, therefore, petitioner would appear to possess the characteristic of centralized management. Petitioner, however, argues on brief that: The entire scope of providing acute care hospital services by Petitioner was through its Owner-Physicians and include hiring, firing, promoting, suspending and discharging hospital employees as well as overseeing the other day-to-day operations at the hospital. Indeed, the Owner-Physicians did not delegate the authority to hire, fire, reprimand, suspend, or promote hospital employees or to borrow money on behalf of Petitioner. In making the various business decisions for Petitioner, the Owner-Physicians did so as a group and regarded those decisions as being made not only for Petitioner but for each Owner-Physician as well. [Citations to record omitted.] In its reply brief, petitioner also focuses on its check-signing authority arrangement, arguing that "all Owner-Physicians had to approve *770 any purchase in excess of $ 1,000 as well as endorsing any check of $ 1,000 or more." [19] The relevant testimony offered by petitioner's associates appears contradictory. More specifically, while Dr. McVey testified on direct examination that it was the "owner-members" (i.e., the associates) of petitioner who had the authority to hire, fire, discipline, and suspend employees, borrow money and approve *771 payments on behalf of petitioner, implement Hospital policies, procedures, or protocols, and approve nonowner physician contracts, Dr. Khuri (who was petitioner's President during the taxable years in issue) testified that it was petitioner's Board of Directors that "ran the Association" and had the authority to hire, fire, and discipline employees, approve payments of $ 1,000 or more, determine staffing patterns for the Hospital, and give final approval of policies and procedures for Hospital operations. [20] *772 Dr. Khuri also testified that, to the extent that the Hospital administrator approved payments of less than $ 1,000, he did so under the authority delegated to him by the Board of Directors, and, to the extent that he took action with respect to hiring or firing employees, he did so at the Board's specific direction. See Ahola v. United States, 300 F. Supp. 1055, 1058 (D. Minn. 1969) (noting that clinic manager's authority was delegated to him by and derived from the authority of the Board of Trustees).
The stipulations submitted by the parties in the instant case contain similar contradictions with respect to the management of petitioner. The parties stipulated that "Beginning with the initial lease in 1964 and thereafter overall operations of the petitioner were under the direct *2241 charge of the owner physicians of petitioner. Petitioner through its owner physicians also approved and hired other physicians." [21] *773 Other stipulations, however, refer to exhibits containing descriptions of (1) "duties performed by the Board of Directors of the petitioner" (and shared at various times by its members), and (2) "minutes of the recorded Board of Directors meetings of petitioner during the years in issue." An examination of those exhibits and their descriptions indicates that petitioner's Board of Directors and the officers elected by the Board of Directors managed the affairs of petitioner. The confusion in the testimony and stipulations as to whether petitioner was managed directly by its associates or by its Board of Directors apparently is derived from the fact that petitioner's Board of Directors included, during the taxable years in issue, all three of its associates, or "owner-members." On brief, respondent acknowledges that all of petitioner's associates sat on the board, but argues that Although in the years at issue, all of the associates of [petitioner] were also officers and members of the Board of Directors of the association, the business of Richlands Medical Association was clearly conducted by a centralized management as that term is used in Treas. Reg. sec. 301.7701-2. We agree with respondent. Section 301.7701-2(c)(1), Proced. and Admin. Regs., states that "An organization has centralized management if any person (or any group of persons which does not include all the members) has continuing exclusive authority to make the management decisions." (Emphasis supplied.) In light of such language, several commentators *774 have expressed a concern that centralized management may be lacking where the board of directors of an organization includes all of its owners or members. For example, Eaton states at 4-3 that: In business corporations, except very small ones, the shareholders and directors are seldom identical. Usually less than all the shareholders are elected directors, and frequently less than all the directors are chosen as officers. In categorizing an unincorporated professional association for tax purposes, it is unclear whether this numerical funneling-down is the test or whether the attribute of centralized management theoretically exists solely by reason of the fact that the shareholders elect the directors, who elect the officers, even when the shareholders, directors and officers are all the same people. In a fairly large group, it may be desirable to play "safe" by having the board of directors consist of less than all the shareholders * * *. [Fn. ref. omitted.] In another chapter, Eaton states: While the Regulations under the 1939 Code and the cases emphasized the technical or formal representative capacity of those conducting the enterprise, the Kintner Regulations added the element *775 of numbers, indicating that the managers should consist of less than all the owners. The validity of this requirement is dubious at best. [Eaton at 27-25.] [22] For the following reasons, however, we hold that an identity between the owners and directors of an entity at a particular point in time does not preclude "centralized management" within the meaning of section 301.7701-2(c), Proced. and Admin. Regs., and that, notwithstanding such identity of owners and directors in the instant case, petitioner possessed the characteristic *776 of centralized management under the regulations. Section 301.7701-2(c)(2), Proced. and Admin. Regs., states that the persons who have management authority in a corporation "may, or may not, be members of the organization." While we recognize that respondent's rulings are not binding precedent in this Court, [23] respondent has interpreted the regulations to permit a finding of centralized management even where the board of directors includes all the members at a particular point in time. In Revenue Ruling 71-574, 1971-2 C.B. 432, two doctors comprised the membership of a professional association and also elected themselves as the sole members of the board of directors. The bylaws of the association provided that the board could be composed of between two and five persons. On the issue of centralized management, the Revenue Ruling states: In the instant case, even though all of the association's members happen to be members *2242 of its board of directors, i.e. the management group, at a particular time, this does not preclude the association from having centralized management, despite the parenthetical language of [section 301.7701-2(c)(1), Proced. *777 and Admin. Regs.] * * * since the authority to make management decisions is not vested in the entire membership as such, but in the board of directors. While the directors do have to be members of the association, all members do not have to be directors. (Cf. Guy T. Helvering v. Coleman-Gilbert Associates, 296 U.S. 369 (1935), Ct. D. 1067, C.B. XV-1, 261 (1936). The approach taken in the Revenue Ruling is consistent with our interpretation of the provision in the instant case. In our view, the parenthetical language of section 301.7701-2(c)(1), Proced. and Admin. Regs., characterizing management as a "group of persons which does not include all the members," should be read to include situations in which the management group is not required, under an organization's governing documents, to include all the members. See Thies, "Professional Service Organizations: A Comment," 24 Tax L. Rev. 291, 294 (1969) (arguing that the regulation would be "in error" to the extent it could be construed otherwise). Our interpretation of section 301.7701-2(c), Proced. and Admin Regs., is consistent with several older cases following Morrissey v. Commissioner, 296 U.S. 344 (1935), [24] and with our more *778 recent decision in Hynes v. Commissioner, 74 T.C. 1266 (1980). In Helvering v. Coleman-Gilbert Associates, 296 U.S. 369 (1935), decided on the same day as and following Morrissey, the Supreme Court found centralized management in a business trust where all of the beneficiaries also were named as trustees. In so holding, the Supreme Court noted the lack of formalities in the trustees' activities and the fact that the trustees did not exercise all of the powers given to them in the trust instrument, but stated that "The parties are not at liberty to say that their purpose was other or narrower than that which they formally set forth in the instrument under which their activities were conducted." 296 U.S. at 374. In Pelton v. Commissioner, 82 F.2d 473 (7th Cir. 1936), affg. 32 B.T.A. 198 (1935), centralized management was again found in a situation in which the trustees and beneficiaries of a trust were identical. Pelton involved three doctors who entered into an indenture whereby they transferred to themselves, as trustees, *779 various office furniture and medical equipment. The doctors were the sole beneficiaries and trustees of the trust. Finding Morrissey, Coleman-Gilbert, and two other Supreme Court decisions decided on the same day [25] dispositive of the issue, the Seventh Circuit held that the trust possessed all of the "substantial points of resemblance to a corporation" (including centralized management) specified in those decisions. Pelton v. Commissioner, 82 F.2d at 476. In Hynes v. Commissioner, supra, we held that centralized management existed where a single individual owned all of the beneficial interests in a trust and also served on its board of trustees. The taxpayer in Hynes, having taken the position that the trust was not taxable as a corporation (and having deducted the trust's losses on his own return), argued that centralization of management was lacking because the other trustees served as his agents and merely performed ministerial duties. In analyzing the question whether the trustees had the "continuing authority to manage the business in a manner resembling the management of a corporate *780 business by a board of directors," we focused on the provisions of the trust agreement, stating: These provisions of the trust agreement show that the trustees had broad powers to act on behalf of the trust, that their authority was not limited to purely ministerial acts, and that their actions did not require ratification by the beneficiary. It is immaterial whether, in reality, the petitioner could make the decisions for all the trustees; the significant fact is that the trustees had the power to act for the trust. See Helvering v. Coleman-Gilbert, 296 U.S. at 374. Hence, we hold that the * * * trust had centralization of management. [74 T.C. at 1283.] [26] Similarly, Bittker & Eustice, "Federal Income Taxation of Corporations and Shareholders," states: What is crucial *781 [with regard to centralized management] is the focus of authority in the *2243 hands of a particular group, in contrast to the mutual agency relationship of a partnership, in which each member can bind the organization by his acts; the corporate form "abhors anarchy of authority." (page 2-7) [27]
In the instant case, the Virginia Act prohibits individual associates from binding the association and confers management authority upon the board of directors. Petitioner's Bylaws mirror the Virginia Act in conferring management power on the Board of Directors, and petitioner has failed to convince us that it was not managed by such Board of Directors, acting as such in a representative capacity. Finally, there is no requirement in petitioner's governing instruments that petitioner's board of directors include all of petitioner's associates. Accordingly, we hold that petitioner possessed the characteristic of centralized management. 3. Limited Liability
Pertinent provisions of section 301.7701-2(d), Proced. and Admin. Regs., concerning *782 limited liability, are set forth in the Appendix. The provisions of the Virginia Act regarding the liability of associates are section 54-886 and section 54-892. Section 54-886 provides: 54-886. Professional relationships between persons not affected. -- The provisions of this chapter shall not be construed to alter or affect the professional relationship between a person furnishing professional services and a person receiving such service, either with respect to liability arising out of such professional service or the confidential relationship between the person rendering the professional service and the person receiving such professional service, if any, and all such confidential relationships enjoyed under the laws of this State, whether now in existence or hereafter enacted, shall remain inviolate. Provisions such as section 54-886, which speak of preserving the relationship between the professional and his client or patient, are referred to as "savings clauses." See Comment: "Limited Liability for Shareholders in Virginia Professional Corporations: Fact or Fiction?," 21 U. Rich. L. Rev. 571, 575 (1987). Section 54-892 of the Virginia Act, which deals more specifically with *783 liability, provides: 54-892. Personal liability of associates; liability of association for acts of associates, etc. -- Any associate of a professional association shall remain personally and fully liable and accountable for any negligent or wrongful acts, or misconduct committed by him, or by any person under his direct supervision and control, while rendering professional services on behalf of the association to the person for whom such professional services were being rendered. Such associate shall not, by reason of being an associate, be personally liable for any debts or claims against, or the acts or omission of the association or of another associate or employee of the association, but the association shall be liable for the acts or omissions of its associates, officers, agents, employees and servants to the same extent to which a corporation would be liable for the acts or omissions of its officers, agents, employees and servants while they are engaged in carrying on the corporate business. Petitioner argues in its reply brief that it lacked the characteristic of limited liability because: "While section 54-892 provides a degree of limitation on a member's liability, it also *784 prescribes that a member is still personally liable for the acts of one under his direction or control who renders services for the association." Petitioner also points to the fact that its associates personally were liable for most debts of petitioner due to the endorsement of the note by the associates and the guarantee of other obligations of petitioner by the associates. We reject petitioner's arguments regarding the effect of its associates' endorsement or guarantee of petitioner's obligations. Any personal liability of petitioner's associates in that regard arose as a matter of contract rather than under "local law," as contemplated by the regulations. [28] *785 Shareholder guarantees of corporate obligations are not uncommon in the context of closely held corporations, Hynes v. Commissioner, 74 T.C. 1266, 1285 (1980), and the fact that such guarantees are needed to render the shareholders liable for corporate obligations underscores the fact that the shareholders are not otherwise liable under local law. Note: "Shareholder-Guarantor Fees: Deductible Business Expenses or Dividends?," 40 Tax. Lawyer 905 n.1 (1987). We also reject petitioner's argument that its associates lacked limited liability by reason of their personal liability for the negligence or misconduct of those under their direct supervision and control. Section 54-892 of the Virginia Act renders associates liable for the negligence or misconduct of persons under their direct supervision and control only "while rendering professional services" on behalf of the association. *2244 Section 54-885 of the Virginia Act provides that all associates of a professional association shall be employees of the association, and petitioner's associates were treated by petitioner as employees in connection with their performance of medical services. As discussed below, we find that the personal liability referred to in section 54-892 of the Virginia Act relates to an associate in his capacity as employee, or agent, of a professional association, and not in his capacity as owner of a professional association. *786 Section 301.7701-2(d), Proced. & Admin. Regs., by contrast, deals with the personal liability of an organization's "members," or owners. We therefore hold that petitioner possessed the characteristic of limited liability. In order to evaluate the impact of the Virginia Act with respect to an associate's liability, we first must consider the general rules regarding tort liability of corporate agents. Especially relevant is the common law rule that a corporation's agents (including employees) remain liable for their own negligence notwithstanding the fact that such negligence occurs while performing services on behalf of the corporation. See Fletcher Cyclopedia of the Law of Private Corporations, sec. 1135 (1986 rev.); American Law Institute, 2 Restatement of the Law of Agency 2d (referred to hereinafter as Restatement), secs. 343, 350 (1958); H. Henn & T. Alexander, Laws of Corporations, p. 608 (3d ed. 1983); F. Mechem, A Treatise on the Law of Agency, secs. 1460-1461 (2d ed. 1982). While suing a corporation for the negligent acts of its agents is often "more convenient or effective" than suing the agent, corporate liability under the doctrine of respondeat superior is derivative, *787 or secondary, in nature and in no way shields an agent from liability for his own negligence. Mechem, supra p. 1082. Viewing the Virginia Act in the context of such a well-established rule regarding agent's liability, and having found no contrary rule under Virginia law, the statement in section 54-892that associates "remain" liable for their own negligent and wrongful acts appears to be merely a codification or preservation of the common law rule applicable to corporate agents, rather than a means of expanding the liability of associates in their capacity as owners. Petitioners, however, focus their argument on the additional language in Virginia Act section 54-892 that associates may be held liable for the misconduct of persons under their "direct supervision and control" while rendering professional services, and argue that such additional liability precludes "limited liability" under section 301.7701-2(d), Proced. and Admin. Regs. We disagree. The notion that a corporation's agents may be held liable for the negligence of other agents under their direct supervision and control also finds precedent at common law. The Restatement indicates that an agent may be held liable for *788 the conduct of other agents if he is at fault in supervising or controlling them. See Restatement sections 358(1), 344, 351, 356, and the accompanying Comments. The Fletcher Cyclopedia of the Law of Private Corporations, supra, similarly states (at 278) that The superior or managing officer of a corporation cannot be held liable for the misconduct of a subordinate servant or employee unless the act is done with his consent or his order or direction, "and a representative of the master is not personally liable for the conduct of other agents or servants of the same master under him, unless he makes himself a participant therein in some way, either by actual participation, by directing their conduct, or otherwise. * * *" [Emphasis supplied; fn. refs. omitted.] See also Mechem, supra at 1098 ("superior agent" may be held liable for the negligent exercise of his power of control over other servants). Considering such common law notions, we find that the rule imposing liability for the misconduct of those under an associate's "direct supervision and control" in the rendering of professional services is merely an extension of the rule preserving liability for the associate's own negligence *789 and therefore relates to associates in their capacity as agents, rather than owners, of the association. Several cases holding the 1965 Regulations invalid provide support for our analysis of limited liability in the instant case. In Kurzner v. Commissioner, 413 F.2d 97 (5th Cir. 1969), the Fifth Circuit considered the classification of an entity organized under the Florida Professional Service Corporation Act (the FloridaAct). With respect to the liability of "shareholder-professionals," the operative language of the FloridaAct virtually was identical to that contained in sections 54-886 and 54-892 of the Virginia Act. More specifically, the relevant provision of the FloridaAct, as in effect for the taxable years in issue in Kurzner, provided that: Nothing contained in this act shall be interpreted to abolish, repeal, modify, restrict or limit the law now in effect in this state applicable to the professional relationship and liabilities between the person furnishing the professional services and the person receiving such professional service and to the standards for professional conduct. Any officer, shareholder, agent, or employee of a corporation organized under this act *790 shall remain personally and fully liable and accountable for any negligent or wrongful acts or misconduct committed by him, or by any person under his direct supervision and control, while rendering *2245 professional service on behalf of the corporation to the person for whom such professional services were being rendered.[29] *791 Focusing its attention on the above provision, the Fifth Circuit found that the entity possessed the attribute of limited liability under the Kintner Regulations. In that regard, the court characterized the enactment of the provision as "a seeming excess of caution," in that the provision merely "made clear that the shareholder-professionals would not be immune from liability for their own conduct." 413 F.2d at 107. The court went on to state that, in a Florida professional service corporation, personal liability is limited in a professional corporation to the same extent as in any other corporation. Although a shareholder-employee must necessarily be responsible for his misconduct, the corporate form nonetheless shields the shareholder from a considerable amount of contractual and tort liability. [Kurzner v. Commissioner, 413 F.2d at 108.] [30] *792 Finding that the entity would qualify as a corporation under the Kintner Regulations, the Fifth Circuit went on to invalidate the 1965 Regulations as arbitrary and discriminatory. 413 F.2d at 111. [31] See also Holder v. United States, 289 F. Supp. 160 (N.D. Ga. 1968), affd. per curiam 412 F.2d 1189 (5th Cir. 1969) (finding entity organized under Georgia Professional Association Act to be corporation; affirmed by the Fifth Circuit solely on basis of Kurzner v. United States, supra). In O'Neill v. United States, 410 F.2d 888 (1969), the Sixth Circuit considered the classification of an entity organized under the Ohio Professional Association *793 law (the OhioAct). The Ohio Act incorporated by reference Ohio's general corporation law except as specifically provided in the OhioAct. With respect to liability, the OhioAct contained a savings clause similar to section 54-886 of the Virginia Act. [32] Focusing on that provision, the Sixth Circuit stated that: The statute however does not remove the limited liability of the shareholder; it merely preserves the personal liability of the professional man in his professional dealings with patients. Ohio Rev. Code. sec. 1785.04. This liability has nothing to do with his status as a shareholder. The shareholder in his capacity as a shareholder does enjoy limited liability. [O'Neill v. United States, 410 F.2d at 898; emphasis supplied.] Thus, as we have done in the instant case, the Sixth Circuit in O'Neill viewed the shareholder-professionals *794 of a professional corporation as acting in a dual capacity, i.e., as shareholders and as employees, and evaluated their liability separately with respect to each capacity. [33]Section 54-892 of the Virginia Act suggests that such separation of capacities is appropriate in stating that an associate shall not, "by reason of being an associate," be liable for claims against the association or its other associates or employees.
Our holding that limited liability is present in the instant case is supported *795 further by recent *2246 state court decisions implementing provisions analogous to sections 54-886 and 54-892 of the Virginia Act. In We' re Associates Co. v. Cohen, Stracher & Bloom, 103 A.D. 2d 130, 478 N.Y.S. 2d 670 (2d Dept. 1984), affd. 65 N.Y. 2d 148, 490 N.Y.S. 2d 743 (1985), the shareholders of a New York professional service corporation were sued individually for rents due under a lease executed solely in the name of the corporation. The Appellate Division, in affirming the lower court's determination striking the shareholders' names as defendants, examined the effect of N.Y. Business Corporation Law sec. 1505(a) (McKinney 1986), which provides (similarly to section 54-892 of the Virginia Act) that Each shareholder, employee or agent of a professional service corporation shall be personally and fully liable and accountable for any negligent or wrongful act or misconduct committed by him or by any person under his direct supervision and control while rendering professional services on behalf of such corporation. Regarding the effect of such provision, the Appellate Division, citing a prior decision, stated that the liability imposed upon a shareholder of a professional corporation *796 by section 1505 of the Business Corporation Law is simply a reflection of the common law rule that a shareholder is liable for those torts of the corporation in which he is a participant * * *, or which are committed by those acting under his direct supervision and control. (Restatement, Agency, 2d, section 358, Comment a) [We' re Associates Co. v. Cohen, Stracher & Bloom, 478 N.Y.S.2d at 673-674; citation omitted; emphasis supplied.] The court went on to conclude that the members of New York professional corporations are to enjoy limited liability with respect to ordinary corporate business debts such as the rents in issue in that case. [34] *797 In Birt v. St. Mary Mercy Hospital of Gary, Inc., 175 Ind. App. 32, 370 N.E. 2d 379 (1977), an emergency room patient named the physician who had treated him, as well as all the other physician-stockholders of such doctor's professional corporation, as defendants in a malpractice action. None of the nontreating physicians were present at the hospital or scheduled to be on duty when the plaintiff was treated, and none of the nontreating physicians advised the treating physician on the treatment or diagnosis or had the right to direct such treatment. With respect to liability, the savings clause of the Indiana Medical Professional Corporation Act provided that: This act does not modify any law applicable to the relationship between a person furnishing professional medical service and a person receiving such service, including liability arising out of such professional service. [Birt v. St. Mary Mercy Hospital of Gary, Inc., 370 N.E. 2d at 383, citing Ind. Code Ann. section 23-1-14-14 (Burns 1971).] Focusing on that provision, the court rejected the plaintiff's argument that the provision imports the vicarious liability of the Uniform Partnership *798 Act to apply to associating physicians. Birt v. St. Mary Mercy Hospital of Gary, Inc., 370 N.E. 2d at 383, 385. The court accordingly refused to hold the other shareholders of the professional corporation liable for the malpractice of the treating physician. See also Fure v. Sherman Hospital, 55 Ill. App.3d 572, 371 N.E. 2d 143 (1977); Annotation, "Professional Corporation Stockholders' Nonmalpractice Liability," 50 A.L.R. 4th 1276; Annotation, "What Constitutes Professional Services within Meaning of Statute Preserving Individual Liability of Professional Employees of Professional Corporation, Association, or Partnership," 31 A.L.R. 4th 898. While we are aware of one North Carolina case in which the court interpreted a savings clause to preserve joint and several liability among physician-shareholders for each other's negligence, [35] the opinion in that case contains virtually no reasoning on the issue of vicarious liability, and has been criticized. See Comment: "Limited Liability for Shareholders in Virginia Professional Corporations: Fact or Fiction?," 21 U. Rich. L. Rev. 571, 582 (1987). In the absence of any indication that a Virginia court would construe section 54-886 of *799 the Virginia Act to "import" vicarious liability, [36] *800 the mere existence *2247 of such possibility is not dispositive. Rather, as the Fifth Circuit stated in Kurzner v. United States, 413 F.2d 97, 108 n.52 (5th Cir. 1969) (in response to the Government's contention that a Florida court might construe the provision involved therein to impose "virtually unlimited" liability): we have more than a little hesitation about determining corporateness by what some court might possibly do at sometime in the future; we think the more appropriate course is to accept the reasonable meaning of presently existing legal provisions. Accordingly, we hold that petitioner possessed the characteristic of limited liability. Because we have held that petitioner possessed three of the four characteristics distinguishing corporations from partnerships under section 301.7701-2, Proced. and Admin. Regs., we will not address the question of whether petitioner possessed the characteristic of free transferability of interests. Accordingly, we hold that petitioner was, during the years in issue, an association taxable as a corporation. Reasonable Compensation
We next address the issue of petitioner's deduction for compensation paid to its associates. Section 162(a)(1)allows as a deduction "a reasonable allowance for salaries or other compensation for personal services actually rendered," to the extent that such amounts are paid or incurred in carrying on a trade or business. Section 1.162-7, Income Tax Regs., *801 provides in relevant part that: The test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services. * * * An ostensible salary paid by a corporation may be a distribution of a dividend on stock. This is likely to occur in the case of a corporation having few shareholders, practically all of whom draw salaries. If in such a case the salaries are in excess of those ordinarily paid for similar services and the excessive payments correspond or bear a close relationship to the stockholdings of the officers of employers, it would seem likely that the salaries are not paid wholly for services rendered, but that the excessive payments are a distribution of earnings upon the stock. * * * The form or method of fixing compensation is not decisive as to deductibility. While any form of contingent compensation invites scrutiny as a possible distribution of earnings of the enterprise, it does not follow that payments on a contingent basis are to be treated fundamentally on any basis different from that applying to compensation at a flat rate. * * * In any event the allowance for the compensation paid may not exceed what *802 is reasonable under all the circumstances. It is, in general, just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under the like circumstances. As indicated by the above-quoted regulation, there is a two-prong test for deductibility under section 162(a)(1): the payment must be (1) reasonable in amount, and (2) solely for services. Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1243 (9th Cir. 1983), revg. on another matter and remanding a Memorandum Opinion of this Court. The two prongs, however, are "inextricably wed" to one another, Nor-Cal Adjusters v. Commissioner, T.C. Memo. 1971-200, 30 T.C.M. 837, 842, 40 P-H Memo T.C. par 71,200 at 800, affd. 503 F.2d 359 (9th Cir. 1974), and the existence of a compensatory purpose can often be inferred to the extent that the amount is determined to be reasonable.[37]Elliotts, Inc. v. Commissioner, supra at 1243. "Where officer-shareholders, who are in control of a corporation, set their own compensation, careful scrutiny is required to determine whether the alleged compensation is in fact a distribution of profits." Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. 1142, 1156 (1980). *803 In Mayson Mfg. Co. v. Commissioner, 178 F.2d 115, 119 (6th Cir. 1949), the Sixth Circuit provided a "rather comprehensive listing of pertinent factors for consideration" *2248 in reasonable compensation decisions. Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner, 61 T.C. 564, 567 (1974), affd. 528 F.2d 176 (10th Cir. 1975). Those factors are: the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; *804 comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. The action of the Board of Directors of a corporation in voting salaries for any given period is entitled to the presumption that such salaries are reasonable and proper. * * * [Mayson Mfg. Co. v. Commissioner, 178 F.2d at 119.] The Sixth Circuit also expressed the general rule that in reasonable compensation cases, no single factor is decisive; rather, "every case of this kind must stand on its own facts and circumstances." 178 F.2d at 119. See also Miller Mfg. Co. v. Commissioner, 149 F.2d 421, 423 (4th Cir. 1945), affg. a Memorandum Opinion of this Court. In the instant case, respondent determined that the deductions claimed by petitioner for amounts paid to its associates exceeded a reasonable allowance for salaries or other compensation for personal services rendered. The following chart lists the amounts allowed and disallowed by *805 respondent with respect to each associate: Taxable Year Ended
Deduction for Compensation
10/31/82
Allowed
Disallowed
Dr. McVey
$ 397,556.12
$ 580,221.88
Dr. Khuri
* 241,041.39
461,509.61
Dr. Moore
191,713.62
374,838.38
10/31/83
Dr. McVey
$ 324,759.38
$ 548,538.61
Dr. Khuri
231,435.83
441,435.17
Dr. Moore
162,467.94
361,363.06
Respondent's determination of the amount of compensation allowable as a deduction is presumed correct, and petitioner bears the burden of proving that a greater amount is appropriate. Rule 142(a); Botany Worsted Mills v. United States, 278 U.S. 282 (1929); Miller Mfg. Co. v. Commissioner, supra.As we have found, the amounts allowed by respondent in his statutory notice of deficiency as compensation with respect to each associate equalled 100 percent of the "collections" attributed to the associate's direct patient services in petitioner's records. At the outset, we note that in view of the large increases in associate compensation during the years in issue, the magnitude of such increases as compared with the increases in petitioner's gross income, and the failure of petitioner to pay dividends, a number of the factors listed in Mayson Mfg. Co. v. Commissioner, supra, *806 appear to weigh against petitioner. No single factor is determinative, however, and the weight to be accorded each factor may vary with the circumstances. Pepsi Cola Bottling Co. of Salina, 61 T.C. at 567. We thus turn to a consideration of the parties' arguments. Both of the parties in the instant case submitted expert reports with respect to the reasonable compensation issue. [38] The expert reports are consistent to the extent that both calculate reasonable compensation for the associates' medical services for patients based on a percentage of the "collections" from patients for those services. As discussed below, petitioner's expert report adjusts the "collections" figure recorded by petitioner upward to reflect a "national norm," while respondent's report limits compensation for patient services to 85 percent of petitioner's recorded collections. The expert reports also are consistent to the extent that both allow additional amounts of compensation for the executive or administrative duties undertaken by petitioner's associates. Petitioner's expert report focuses in that regard on the associates' medically-related supervisory positions as heads *2249 of departments of the Hospital, *807 while respondent's report focuses on their services as petitioner's officers. The computations made in petitioner's expert report can be segmented into two categories. In one part of the report, petitioner's expert analyzes the amount reasonably payable to associates for patient services. In that regard, petitioner's expert uses collections from patients as a measure of reasonable compensation, but finds the "collections" figures actually recorded by petitioner to be artificially low and in need of adjustment. Petitioner's expert bases his conclusion that the "collections" figures recorded by petitioner were artificially low upon a comparison of such "collections" to the "billings" of petitioner's associates. His *808 report states that the ratio of collections to billings of petitioner's associates averaged 64.1 percent for the year ended October 31, 1982 and 54.4 percent for the year ended October 31, 1983. He then compares those ratios with a "national norm" of 92 percent. The report further concludes that the "startling difference" between the associates' collection ratios and the "national norm" was caused by petitioner's practice of allocating nondesignated partial payments to the Hospital component of a bill first, before crediting any portion of receipts to physician services. In that regard, the report states: "If the payments had been credited properly, the physician collection rates would have reflected the national norm of 92 percent of billings." Accordingly, petitioner's expert adjusts the "collections" of petitioner's associates upward, to 92 percent of their billings (i.e., the "national norm") and uses the resulting figures as reasonable compensation for patient services. We find the analysis of petitioner's expert to be not entirely persuasive for two reasons. First, the conclusion of petitioner's expert that associate collections should be adjusted to reflect a "national norm" *809 is based on the assumption that petitioner's method of allocating nondesignated partial payments triggered the divergence from such national norm. However, neither petitioner's expert report nor any other evidence offered by petitioner analyzes the effect of petitioner's receipt allocation practices in quantitative terms. While petitioner's expert report asserts that "numerous patient ledgers were reviewed" to verify its conclusion, the report presents neither any tabulation of the amount of nondesignated partial payments nor any information as to the frequency of occurrence of nondesignated partial payments. Moreover, petitioner's expert report states that "generally," third party payors would identify their payments as attributable to Hospital or physician charges, and we have found that the situation of nondesignated partial payments did not occur in the case of partial payments from Blue Cross, Blue Shield or other Government insurance programs. We therefore find little support for the apparently unsupported conclusion of petitioner's expert that petitioner's associate collection rate "would have equalled the national norm" had petitioner not followed the practice of allocating *810 nondesignated partial payments first to Hospital charges. Second, we are not convinced that the 92 percent collection rate used by petitioner's expert as a "national norm" actually represents an appropriate standard against which to measure petitioner's collections. Petitioner's expert admitted that the source of the 92 percent rate relied upon in his report was an article from "Medical Economics," entitled "Getting Paid is Getting Tougher," which specifically dealt with the collection ratios of office-based, as opposed to hospital -based physicians. The fact that such article specifically limits its discussion to "office-based M.D.'s" suggests that there is a difference in the data applicable to hospital-based physicians. We note that respondent's expert report lists as one of its sources a study specifically dealing with hospital-based physicians, and petitioner presented no evidence to refute the suggested difference. In light of the foregoing, we decline to calculate "reasonable compensation" for the services of petitioner's associates to patients by assuming, as petitioner's expert would have us do, that their collections were actually 92 percent of their billings and allowing *811 compensation equal to such assumed collections. Like petitioner's expert report, the report of respondent's expert determines reasonable compensation for the associates'services to patients as a percentage of collections. [39] *812 Respondent's *2250 expert, however, uses the collections figures actually recorded by petitioner as a base, and calculates reasonable compensation for the associates' services to patients as 85 percent of such collections. Respondent's expert uses that 85 percent figure based on his conclusion that the Hospital's nonowner physicians were compensated at the rate of 85 percent of collections, and on his assumption that such "practice" was "accepted." We find, however, that such conclusions are not supported by the evidence in the instant case. Of the six employment contracts of nonowner physicians submitted into evidence in the instant case, only two provide for compensation equal *813 to 85 percent of collections (as an alternative to a fixed amount of compensation, with the physician receiving whichever is greater). Two of the contracts provide for fixed compensation or compensation based on 100 percent or 110 percent of collections, [40] and a third contract refers to the receipt of 100 percent of collections for certain months, less salary already received. The sixth contract submitted into evidence provides only for a fixed annual salary. Moreover, during the year ended October 31, 1982, four of petitioner's eight nonowner physicians actually received more than 85 percent of their collections as compensation; eight of its ten nonowner physicians received more than 85 percent of their collections during the subsequent year. [41] *814 Having weighed all of the evidence before us, we conclude that the adjustments to "collections" proposed by neither expert are appropriate. [42] We hold that petitioner's associates were entitled to receive, as compensation for their services to patients, 100 percent of the collections recorded by petitioner as attributable such services. [43] *815 We next consider the additional compensation warranted for other services performed by petitioner's associates. As noted above, petitioner's expert report assigned a separate value to the medically-oriented supervisory services of petitioner's associates. The report finds that the three associates collectively performed the functions of a director of intensive care, laboratory director, radiology director, stand-by and supervising emergency room physician, director of EKG, director of respiratory therapy, director of anesthesia, and chief of staff. The report then assigns an aggregate value to such services of $ 295,320 for the year ended October 31, 1982, and $ 310,860 for the year ended October 31, 1983, based on a review of salaries paid by Maryland hospitals having less than 200 beds." [44] For the year ended October 31, 1983, aggregate compensation is allocated among the various positions described in petitioner's *816 expert report as follows: Service Provided
Compensation Received
Chief of Staff
$ 43,200
Director of Intensive Care Unit
8,820
Emergency Room Department Physician
Supervision and Stand by   77,400
Director of Anesthesia
57,780
Laboratory Director
60,300
Radiology Director
49,590
Director of Respiratory Therapy
4,770
Director of EKG
9,000
$ 310,860
For the year ended October 31, 1982, petitioner's expert applies a five percent discount to the above figures. At trial, Doctors McVey and Khuri testified that petitioner's associates did have a variety of *2251 medical responsibilities at the Hospital in addition to direct responsibility for patient care, none of which they separately were compensated for. Dr. McVey testified that, during the years in issue, he served as chairman of the *817 physiotherapy department, chairman of the intensive care unit, chairman of the obstetrics department, chief of staff (at various times), and co-chairman of the mortality-morbidity conferences. He also testified that he and Dr. Moore were in charge of the emergency room, and that Dr. Moore was in charge of radiology as well as being laboratory director for the Hospital. Dr. Khuri testified that during 1982 and 1983, he served as chief of the medical staff, chief of surgery, director of anesthesia, director of respiratory therapy, chairman of the tissue committee and infection control committee and co-chairman of the mortality and morbidity conference. While we believe that petitioner's associates were charged with medical responsibilities at the Hospital beyond ordinary patient care, we find the methodology used in petitioner's expert report to place a value on such responsibilities lacking in some respects. Notably, the report does not contain any information concerning the amount of time devoted to such responsibilities in either the Maryland hospitals surveyed or by petitioner's associates. Additionally, petitioner offered no significant information as to the hours spent by the *818 associates in their various capacities. The testimony of Dr. McVey on cross-examination also indicates that some of the medical "titles" held by petitioner's associates may have involved limited substantive responsibility, as such titles were unrelated to the associates' own medical specialties. In other cases, we have indicated that it is inappropriate to determine "reasonable compensation" for one individual performing multiple roles by aggregating the salaries of multiple persons each performing one of those roles on a full-time basis. [45]Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner, 61 T.C. 564, 569 (1974), affd. 528 F.2d 176 (10th Cir. 1975); Dockery v. Commissioner, T.C. Memo. 1982-509, 44 T.C.M. 1044, 1046, 51 P-H Memo T.C. par. 82,509 at 2317; Ken Miller Supply, Inc. v. Commissioner, T.C. Memo. 1978-228, 37 T.C.M. 974, 980, 47 P-H Memo T.C. par 78,228 at 973. Although petitioner's expert testified that in the Maryland hospitals surveyed, physicians holding the positions in question also would have patient care responsibilities, we are reluctant to adopt fully his conclusions in the absence of more definitive evidence of the comparability of those Maryland positions *819 with the functions of petitioner's associates. Applying our best judgment in light of all of the evidence bearing upon the additional medical responsibilities of petitioner's associates, we hold that petitioner is allowed an aggregate compensation deduction of $ 200,000 for such services for the year ended October 31, 1983, and $ 190,000 for the year ended October 31, 1982.
Although petitioner's expert report arrives at specific compensation figures (for patient services and medical supervisory responsibilities) of $ 1,487,738 for the year ended 10/31/82 and $ 1,526,682 for the year ended 10/31/83, the report describes those amounts as "the minimum compensation that can be established for the three principals of [petitioner]." (Emphasis in original.) Those "minimum" figures represent significantly less than the $ 2,246,854 and $ 2,070,000 in compensation deductions claimed by petitioner in its returns for the respective years. In another section of his report, however, petitioner's expert purports to conclude that the entire *820 amount claimed by petitioner as compensation to its associates must be reasonable because amounts received by petitioner for services provided to patients were judged reasonable by Medicare, Medicaid, and Blue Cross, who apply a reasonableness standard in determining permissible reimbursement. We find such analysis unconvincing in that petitioner has not shown that such payors separately evaluated the reasonableness of amounts paid to petitioner's associates for their services, as opposed to the reasonableness of gross charges made by petitioner to Medicaid or Medicare subscribers. In fact, on cross-examination, petitioner's expert admitted that, while Medicare required detailed reports concerning the "return on equity capital" of proprietary hospitals, it did not care whether hospital profits were distributed as compensation or as dividends. [46] *821 Moreover, the conclusion of petitioner's expert that payments to petitioner's associates must have been reasonable compensation appears to be based on a misconception that the services of petitioner's associates generated all of the Hospital's profits. Perhaps in view of the disparity between the amount calculated in the report and the amount claimed as compensation deductions on petitioner's *2252 returns, petitioner's expert report states in conclusion that: In addition, further evaluation is being conducted to determine a reasonable compensation level for the following services: (1) Ancillary services rendered to private patients in the office practice. (2) Administrative duties performed by the three principals for RMA and the inpatient hospital facility. While petitioner's expert did not submit additional reports dealing with ancillary services or administrative duties, petitioner requests us to allow additional deductions for amounts attributable to such services and duties. At trial, petitioner's expert testified *822 that, in private practice, doctors bill their patients for ancillary services (such as laboratory work, anesthesia, drugs, x rays, etc.) provided by third parties, and "mark up" those charges beyond the amounts owed to such third parties. Because petitioner treated all ancillary charges as Hospital, rather than physician charges, petitioner argues that an amount should be added to associate collections or billings to reflect such profit, which would have been earned by physicians in a private practice setting. Petitioner also relies on the testimony of Ms. Jean Addison, petitioner's executive secretary and business office manager of the Hospital, that petitioner's associates "generated the majority of [ancillary revenues]" because they were "the major admitters" to the Hospital. We decline petitioner's invitation to allocate a portion of the Hospital's ancillary service charges to its associates. First, petitioner has submitted no quantitative analysis of the "profit" or "markup" which a private physician might expect to earn for ancillary services, or the equivalent amounts which might be attributed to its associates. Second, petitioner has not shown that its associates actually *823 performed any services related to generating ancillary revenues, or that any such services would not be encompassed within the duties for which appropriate compensation has already been allowed. Third, petitioner admits that its associates did not incur the expenses which are incurred by private practitioners and has not explained why its associates should be treated exactly like private practitioners with respect to compensation. Petitioner's submission of schedules documenting outpatient ancillary charges and total Hospital collections for ancillary services during the years in issue, together with petitioner's imprecise and unsupported arguments about such services, are insufficient to support any allocation of additional compensation for such services. As we stated in Jenkins v. Commissioner, T.C. Memo. 1988-292, 55 T.C.M. 1215, 1227, 57 P-H Memo T.C. par. 88,292 at 1485, "we refuse to guess in the absence of a single reliable guide and will not indulge in sheer 'unguided largesse.'" While petitioner's expert did not submit an additional report regarding "administrative" duties, respondent's expert assigned a value to the services of petitioner's associates as "president, vice *824 president and secretary-treasurer" of petitioner. Finding that the associates actually were "equal partners in a chief executive role," [47] *825 respondent's expert report assigned a value of $ 90,750 to such services for each associate for the year ended October 31, 1982, and $ 97,500 for each associate for the year ended October 31, 1983. At trial, petitioner's expert appeared to agree that such amounts were reasonable and stated that they represented compensation for functions not considered in his report. On brief, petitioner states that the value of compensation for such executive functions is not in dispute. Accordingly, we will allow the additional amount found by respondent's expert as attributable to the associates' services as petitioner's officers. [48]
Finally, petitioner argues that additional amounts should be added to the amount found by its expert to reflect the value of services performed by the associates in prior years for which they were undercompensated. See Owensby & Kritikos, Inc. v. Commissioner, T.C. Memo. 1985-267, 50 T.C.M. 29, 41 n.10, 54 P-H Memo T.C. par. 85,267 at 1181 n.10, affd. 819 F.2d 1315 (5th Cir. 1987). In support of its argument, petitioner first points to the cost reimbursement requirements of Medicare, Medicaid, and Blue Cross, which it claims could delay payments for up to two years after the actual medical service had been rendered. At trial, petitioner attempted to introduce into evidence a letter from its expert *826 witness purporting to identify payments that related to services performed in prior years. That letter, however, was excluded from evidence on the grounds that it was not filed within the time *2253 provided by the Rules; respondent's objection to testimony by petitioner's expert that petitioner received money for past services during the years in issue also was sustained. In the absence of any reliable evidence demonstrating that the reimbursement requirements of various insurers produced financial distortions during the years in issue, and correlating such distortions with the compensation of petitioner's associates, we are unable to allow any additional compensation deductions based on petitioner's argument regarding reimbursement practices. [49] *827 Petitioner also points to the fact that, in prior years, its associates consistently received compensation less than their "billings," arguing that such fact establishes that they were undercompensated in those years. Petitioner asserts that our decisions in Klamath Medical Service Bureau v. Commissioner, 29 T.C. 339 (1957), affd. 261 F.2d 842 (9th Cir. 1958), and McClung Hospital, Inc. v. Commissioner, T.C. Memo. 1960-86, establish a "billings standard" for physicians -- i.e., a rule of law that physicians are always entitled to compensation equal to 100 percent of their billings. Aside from the logical problems with such a rule (especially where, as here, the payor incurs all overhead and other expenses associated with the physicians' practices), we find that such rule is not prescribed by the cases cited by petitioner. In Klamath Medical Service Bureau v. Commissioner, supra, a corporation was engaged in providing medical services under contracts with subscribers. The corporation *828 also entered into contracts with physicians (who were stockholders in the corporation) under which the physicians agreed to a schedule of fees for services to be performed for the corporation's subscribers. After performing such services, the physicians would "bill" the corporation in accordance with the agreed-upon fee schedule. Klamath Medical Service Bureau v. Commissioner, 261 F.2d at 844. While the scheduled fees in Klamath were unreasonably low when compared with amounts charged for like services by private practitioners, we characterized the arrangement as "not unrealistic" in view of the lessened administrative costs to doctors rendering services under the corporation's subscriber plans. Klamath Medical Service Bureau v. Commissioner, 29 T.C. at 348. Although the corporation in Klamath was not obligated to pay its stockholder-physicians, as compensation for their services, more than 100 percent of the scheduled fees "billed" by such physicians, it paid them over 100 percent of fees during the years in issue pursuant to a practice of dividing all net profits among the physicians. We held that amounts paid to the physicians in excess of 100 percent of their billings represented *829 distributions of the corporation's earnings rather than deductible compensation. In response to petitioner's argument that Klamath creates a rule entitling the physicians in the instant case to compensation of at least 100 percent of their "billings," respondent states on brief that: Petitioner does not understand the facts of Klamath. The billings which were involved in the Klamath case were bills submitted by the doctors to the Klamath Medical Services Bureau, not bills which Klamath sent to patients of the physicians employed by Klamath. There is no information in the Klamath opinion as to the hospital's success in collecting the amounts it billed patients. We agree with respondent. The fees "billed" to the corporation in Klamath, and the gross amounts directly billed to patients by doctors or hospitals, are apples and oranges. We therefore reject petitioner's argument that the Klamath decision requires a conclusion that its associates were undercompensated prior to the years in issue. Petitioner also directs our attention to McClung Hospital, Inc. v. Commissioner, T.C. Memo. 1960-86. In that case, we sustained the compensation deductions claimed with respect to two physicians *830 who were also brothers and majority shareholders in a hospital corporation. The compensation deductions were sustained in McClung notwithstanding the fact that (1) the aggregate compensation received by the brothers was equal to 100 percent of their billings to patients, without reduction for expenses or uncollectible amounts, (2) one of the brothers actually received more than his aggregate billings, and (3) the nonshareholder physicians employed by the hospital were compensated based on 60 percent of their billings to patients. In sustaining the compensation deduction claimed by the taxpayer in McClung, we noted that the brothers, who, as noted above, were also officers in the corporation, were in direct charge of the overall operation and administration of the hospital in addition to serving patients. We found that such "additional responsibilities" justified *2254 the more liberal payments made to the brothers than to junior physicians. Petitioner's argument concerning the effect of McClung appears to ignore the rule that reasonable compensation cases turn on their own peculiar facts and circumstances; thus, the fact that compensation in excess of patient billings was found reasonable *831 with respect to one of the physicians in McClung does not decide the amount reasonably payable to petitioner's associates. In the instant case, moreover, our opinion specifically allocates additional compensation amounts to the responsibilities, beyond direct patient care, undertaken by petitioner's associates. In that regard, our opinion herein is consistent with McClung, in which such additional responsibilities were found to justify the amount of compensation paid. We have considered all of petitioner's other arguments and find them without merit. In summary, we hold that petitioner was entitled to deduct the following amounts as reasonable compensation for the services of its associates: Taxable Year Ended
Taxable Year Ended
10/31/8210/31/83
Amount Attributable
to Direct Patient Services
$ 830,294.13  $ 718,663.16  +
Amount Attributable
to Medical Depart-
mental Responsibilities
190,000   200,000   +
Amount Attributable
to Services as
Officers
272,250   292,500   Total
$ 1,292,544.13
$ 1,211,163.16
We note in conclusion that the testimony offered by petitioner's associates and by its expert, as well as petitioner's Bylaws, indicate that it was petitioner's practice to distribute all funds left *832 after the payment of Hospital expenses (and the setting aside of reserves) among the associates at year end. During the years in issue, petitioner chose to treat all of those distributed amounts as deductible compensation. On cross-examination, petitioner's expert, who was a C.P.A., was unable to explain how petitioner ever could have been expected to end up with a "profit" at the corporate level using such system of compensation, preferring to note that another expert would be testifying on the entity classification issue. In Klamath Medical Service Bureau v. Commissioner, supra, we found similar testimony by the taxpayer's president -- namely, that the corporation distributed all amounts in excess of expenses and reserves to the physicians -- indicative of an intent to distribute earnings under the guise of salary. In Klamath, we stated that: It seems clear from this testimony that under its contract with member physicians petitioner intended that all of its earnings in excess of amounts necessary for its operation, planned expansion, and reserves were to be distributed to its member-stockholder physicians. Viewed in that light the contract provides not only a method of computation *833 for services rendered but also a method for distribution of its profits to its stockholders. We are convinced from this record that petitioner, after attaining its objective of providing adequate medical, surgical, and hospital facilities for the people of Klamath County, fully intended its earnings and profits should be distributed to its stockholders and that the method of doing so was that with which we are here concerned. * * * [Klamath Medical Service Bureau v. Commissioner, 29 T.C. at 348-9] While the failure to pay dividends does not automatically trigger a finding that compensation paid to shareholders was unreasonable, Edwin's, Inc. v. United States, 501 F.2d 675, 677 n.5 (7th Cir. 1974), Laure v. Commissioner, 70 T.C. 1087, 1098, 1100 (1978), affd. in part and revd. in part on other issues 653 F.2d 253 (6th Cir. 1981), the system employed in "compensating" petitioner's associates during the years in issue would seem to assure that there would never be funds available for the payment of dividends. Moreover, contrary to what petitioner would have us believe, petitioner's associates were far from the only generators of income for the Hospital; we are not dealing with a situation *834 in which all of an entity's income comes directly from services performed by its shareholders.[50] *835 As we stated in a *2255 similar vein in Dockery v. Commissioner, T.C. Memo. 1982-509, Petitioner, from his testimony, appears to have felt that he was worth whatever compensation he could withdraw from [his wholly-owned corporation]. While that approach is understandable, the Code establishes a different standard. * * * [44 T.C.M. 1044, 1047, 51 P-H Memo T.C. par. 82,509 at 2318. Fn. ref. omitted.] We have exercised our best judgment with the record before us to decide the "reasonalbe" value of the services performed by petitioner's associates. We note in conclusion that it is not our purpose to limit the ability of individuals to share in the profits of their enterprises: Nevertheless, we must, as a matter of law, decide to what extent the earnings from their businesses can properly be paid to them as compensation and to what extent such earnings must be treated as the profits of their business with the resulting tax consequences. Owensby & Kritokos, Inc. v. Commissioner, T.C. Memo. 1985-267, 50 T.C.M. 29, 48 54 P-H Memo T.C. par. 85,267 at 1187-1188, affd. 819 F.2d 1315 (5th Cir. 1987). Negligence
Respondent also determined additions to tax for negligence under section 6653(a) for the years in issue. [51] *837 The addition to tax under section 6653(a)(1) applies if any part of the underpayment is due to negligence. Section 6653(a)(2), by contrast, applies only to that portion of the underpayment attributable to negligence or intentional disregard of rules and/or regulations. Petitioner bears the burden *836 of proving that respondent's determination is in error. Rule 142(a). Negligence is defined as a "lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Neely v. Commissioner, 85 T.C. 934, 947 (1985) (citing Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967). While a showing of honesty, good faith, and disclosure by the taxpayer may preclude the existence of fraud, "good faith does not always negative negligence." Wesley Heat Treating Co. v. Commissioner, 30 T.C. 10, 26 (1958), affd. 267 F.2d 853 (7th Cir. 1959). Rather, the taxpayer must show that he "acted reasonably and prudently and exercised due care." Neely v. Commissioner, supra.
In the instant case, we find that at least a portion of petitioner's underpayment was due to negligence. The deductions claimed by petitioner herein were substantially in excess of the amounts which we have found to represent a reasonable allowance for services provided. See Summit Publishing Co. v. Commissioner, T.C. Memo. 1990-288, 59 T.C.M. 833, 839. Petitioner's Bylaws provided for the distribution of all of petitioner's net profits among the associates at year end, and the method *838 provided therein for dividing net profits -- 75 percent according to each associate's "productivity factor" and the other 25 percent equally -- suggests that the latter component was to be distributed based on ownership, i.e., as dividends. [52]
Petitioner's own expert, moreover, while making a "general" finding that the total amount paid to petitioner's associates was reasonable, actually computed "minimum" reasonable compensation as 66 percent and 74 percent of the amounts claimed by petitioner in its returns for the years ended October 31, 1982 and October 31, 1983, respectively. While petitioner's returns in the instant case were prepared by a C.P.A., that fact, without more, does not insulate petitioner from the negligence addition. Enoch v. Commissioner, 57 T.C. 781, 802-803 (1972). Petitioner has failed to present evidence that its officers, who were well educated and highly-paid individuals, *2256 received any "advice" from such C.P.A. concerning allowable compensation deductions, United States v. Boyle, 469 U.S. 241 (1985), and has failed to show that *839 any advice received was based on all the facts. Leonhart v. Commissioner, 414 F.2d 749, 750 (4th Cir. 1969), affg. a Memorandum Opinion of this Court. [53] In the absence of such evidence, we are unconvinced that petitioner's treatment of all distributions to its associates as compensation represented reasonable and prudent conduct. Accordingly, we hold that the five percent addition provided by section 6653(a) (1) is applicable. The addition provided by section 6653(a)(2) applies only to the portion of the underpayment attributable to negligence or intentional disregard of rules and/or regulations. While petitioner failed to establish that it acted reasonably in treating all distributions to its associates as deductible compensation, we do not believe that addition under section 6653(a)(2) is warranted with respect to the entire underpayment herein. The reasonable compensation issue in *840 the instant case was an intensely contested issue of mixed fact and law where reasonable minds can and often do differ. See United Title Insurance Co. v. Commissioner, T.C. Memo. 1988-38. While we did not accept the findings of either expert witness in their entirety, we found both experts highly qualified and adopted aspects of both expert reports in reaching our conclusions. As noted above, petitioner's expert report calculated "minimum" reasonable compensation for petitioner's associates as $ 1,487,738 and $ 1,526,682 for the years ended October 31, 1982, and October 31, 1983, respectively. To the extent that the compensation deductions claimed by petitioner exceeded such amounts, we hold that the underpayments attributable to such deductions were due to negligence for purposes of section 6653(a)(2). To reflect the foregoing,
Decision will be entered under Rule 155. APPENDIX *2257 Section 301.7701-2(b), Proced. and Admin. Regs.
(b) Continuity of life. (1) An organization has continuity of life if the death, insanity, bankruptcy, retirement, resignation, or expulsion of any member will not cause a dissolution of the organization. On the other hand, if the death, insanity, bankruptcy, *841 retirement, resignation, or expulsion of any member will cause a dissolution of the organization, continuity of life does not exist. * * * (2) For purposes of this paragraph, dissolution of an organization means an alteration of the identity of an organization by reason of a change in the relationship between its members as determined under local law. For example, since the resignation of a partner from a general partnership destroys the mutual agency which exists between such partner and his copartners and thereby alters the personal relation between the partners which constitutes the identity of the partnership itself, the resignation of a partner dissolves the partnership. A corporation, however, has a continuing identity which is detached from the relationship between its stockholders. The death, insanity, or bankruptcy of a shareholder or the sale of a shareholder's interest has no effect upon the identity of the corporation and, therefore, does not work a dissolution of the organization. An agreement by which an organization is established may provide that the business will be continued by the remaining members in the event of the death or withdrawal of any member, but such *842 agreement does not establish continuity of life if under local law the death or withdrawal of any member causes a dissolution of the organization. Thus, there may be a dissolution of the organization and no continuity of life although the business is continued by the remaining members. (3) An agreement establishing an organization may provide that the organization is to continue for a stated period or until the completion of a stated undertaking or such agreement may provide for the termination of the organization at will or otherwise. In determining whether any member has the power of dissolution, it will be necessary to examine the agreement and to ascertain the effect of such agreement under local law. For example, if the agreement expressly provides that the organization can be terminated by the will of any member, it is clear that the organization lacks continuity of life. However, if the agreement provides that the organization is to continue for a stated period or until the completion of a stated transaction, the organization has continuity of life if the effect of the agreement is that no member has the power to dissolve the organization in contravention of the agreement. *843 Nevertheless, if, notwithstanding such agreement, any member has the power under local law to dissolve the organization, the organization lacks continuity of life. * * * Section 301.7701-2(c), Proced. and Admin. Regs.
(c) Centralization of management. (1) An organization has centralized management if any person (or any group of persons which does not include all the members) has continuing exclusive authority to make the management decisions necessary to the conduct of the business for which the organization was formed. Thus, the persons who are vested with such management authority resemble in powers and functions the directors of a statutory corporation. The effective operation of a business organization composed of many members generally depends upon the centralization in the hands of a few of exclusive authority to make management decisions for the organization,and therefore, centralized management is more likely to be found in such an organization than in a smaller organization. (2) The persons who have such authority may, or may not, be members of the organization and may hold office as a result of a selection by the members from time to time, or may be self-perpetuating *844 in office. See Morrissey et al. v. Commissioner, (1935) 296 U.S. 344. Centralized management can be accomplished by election to office, by proxy appointment, or by any other means which has the effect of concentrating in a management group continuing exclusive authority to make management decisions. (3) Centralized management means a concentration of continuing exclusive authority to make independent business decisions on behalf of the organization which do not require ratification by members of such organization. Thus, there is not centralized management when the centralized authority is merely to perform ministerial acts as an agent at the direction of a principal. (4) There is no centralization of continuing exclusive authority to make management decisions, unless the managers have sole authority to make such decisions. For example, in the case of a corporation or a trust, the concentration of management powers in a board of directors or trustees effectively prevents a stockholder or a trust beneficiary, simply because he is a stockholder or beneficiary, from binding the corporation or the trust by his acts. However, because of the mutual agency relationship between members *845 of a general partnership subject to a statute corresponding to the Uniform Partnership Act, such a general partnership cannot achieve effective concentration of management powers and, therefore, centralized management. Usually, the act of any partner within the scope of the partnership business binds all the partners; and even if the partners agree among themselves that the powers of management shall be exclusively in a selected few, this agreement will be ineffective as against an outsider who had no notice of it. In addition, limited partnerships subject to a statute corresponding to the Uniform Limited Partnership Act, generally do not have centralized management, but centralized management ordinarily does exist in such a limited partnership if substantially all the interests in the partnership are owned by the limited partners. Section 301.7701-2(d), Proced. and Admin. Regs. (d) Limited liability. -- (1) An organization has the corporate characteristic of limited liability if under local law there is no member who is personally liable for the debts of or claims against the organization. Personal liability means that a creditor of an organization may seek personal satisfaction *846 from a member of the organization to the extent that the assets of such organization are insufficient to satisfy the creditor's claim. A member of the organization who is personally liable for the obligations of the organization may make an agreement under which another person, whether or not a member of the organization, assumes such liability or agrees to indemnify such member for any such liability. However, if under local law the member remains liable to such creditors notwithstanding such agreement, there exists personal liability with respect to such member. * * * Footnotes
1. Unless otherwise noted, all section references are to the Internal Revenue Code as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. 50 percent of the interest payable on the portion of the underpayment due to negligence.↩
2. The Virginia Act was repealed in 1988. See n. 36, infra.↩
3. In their stipulation of facts, the parties agreed that Doctors McVey, Moore, and Khuri were the sole owners and directors of petitioner beginning in mid-1982 and "including all years in issue under the Notice of Deficiency." However, petitioner's tax return for the taxable year ended October 31, 1983, lists those three physicians as each owning only 25 percent of the "stock" in petitioner, for a total ownership of 75 percent. For purposes of our opinion, we follow the parties' stipulation as to ownership of the association. As noted above, interests in professional associations may be owned only by persons legally qualified to render the professional services for which the association is organized. While one exhibit in the record refers to the receipt of pension and other checks by Dr. Strader's widow, there is no indication in the record that she could have assumed Dr. Strader's status as an associate after his death.
4. Although the Bylaws stated that the number of directors could be determined by the associates from time to time, section 54-882↩ of the Virginia Act requires that the number of directors be changed by amendment of the bylaws or articles of association.
5. Petitioner also deducted $ 12,000 for its taxable year ended October 31, 1982, and $ 9,000 for its taxable year ended October 31, 1983, as directors' fees. Those amounts were allowed by respondent.↩
6. The stipulated exhibit documenting the collections of petitioner's associates lists Dr. Khuri as having collections of $ 241,014.39 for the year ended October 31, 1982. The notice of deficiency apparently inverts two numbers, allowing $ 241,041.39 as a compensation deduction. We believe that the correct number is $ 241,014.39 and use that figure in our computations.↩
*. Collections and compensation of Dr. Strader, who died during the year ended 10/31/82, have been ignored for purposes of these computations.↩
7. Although Dr. Khuri testified that he became a "member" of petitioner in 1978, petitioner's returns for the years in issue indicate that Dr. Khuri did not become an officer of petitioner until the year ended October 31, 1982. Drs. McVey and Moore were apparently officers throughout the six-year period described in the chart. Petitioner's returns, however, indicate an increase in the "stock" ownership of Drs. McVey and Moore between the year ended October 31, 1979 and the year ended October 31, 1980.↩
8. Respondent has not asserted that petitioner is barred, under the doctrine of equitable estoppel, from denying its corporate status, and we therefore do not consider the issue of estoppel. Cf. Sangers Home for Chronic Patients v. Commissioner, 72 T.C. 105 (1979). Equitable estoppel and its various counterparts, such as quasi-estoppel (the "duty of consistency"), are affirmative defenses which must be pleaded and proved. Arkansas Best Corp. v. Commissioner, 83 T.C. 640, 660 n.8 (1984), affd. in part and revd. in part on other issues 800 F.2d 215 (8th Cir. 1986), affd. 485 U.S. 212↩ (1988); Rule 39.
9. On the subject of centralized management, for example, former section 301.7701-2(h)(3), Proced. and Admin. Regs., provided a list of nine matters over which the managers of a professional service organization must have continuing exclusive authority and went on to state: Although a measure of central control may exist in a professional service organization, the managers of a professional service organization in which a member retains traditional professional responsibility cannot have the continuing exclusive authority to determine all of the matters described in the preceding sentence * * * Therefore, centralization of management does not exist in such a professional service organization. [Emphasis supplied.] For a detailed discussion of the 1965 Regulations and their effects, see Eaton, supra↩, Chapter 27.
10. Revenue Ruling 70-101, 1970-1 C.B. 278, 280, also indicated that an organization could be classified as a corporation irrespective of whether it met the requirements of the 1965 Regulations, in essence conceding the invalidity of those regulations. The 1965 Regulations were officially revoked by T.D. 7515↩ (October 17, 1977).
11. The only notable change in the relevant regulations as between 1960 and the years in issue was the deletion of Example (1) of section 301.7701-2(g)↩, Proced. and Admin. Regs., which dealt with classification of a medical clinic. The 1965 Regulations deleted that example, but Treasury failed to reissue it when the 1965 Regulations were revoked.
12. Specifically, section 301.7701-2↩, Proced. and Admin. Regs.
13. The regulations, however, recognize a "modified form" of free transferability of interests which is accorded less significance than such characteristic when present in unmodified form. Larson v. Commissioner, 66 T.C. 159, 185 (1976); sections 301.7701-2(e)(2) and 301.7701-2(g) Ex. (6)↩, Proced. and Admin. Regs.
14. We recognize that petitioner submitted an "expert report" prepared by a C.P.A. on the issue of classification and that such report was admitted at trial without objection. As such report addresses an issue for the Court to decide as a matter of law, we have ignored it. The term "petitioner's expert report" as used hereinafter does not refer to such report.
15. Petitioner, in its reply brief, argues that it failed to adhere to various procedural requirements of the Virginia Act, and that such statute, asserted by respondent to confer corporate status on petitioner, in reality reflects otherwise. Petitioner notes section 54-878 of the Virginia Act, which requires that articles of association be filed before a Virginia professional association is deemed formed, and section 54-879 of the Virginia Act, which requires that amendments to such articles also be filed, and asserts that it never filed its amended articles of association. Assuming arguendo that petitioner actually failed to file such amended articles, we refuse what appears to be a late attempt by petitioner to disavow its status as a professional association under Virginia law. In its petition, petitioner alleged that it was a professional association under the Virginia Act, and in their stipulation of facts, the parties agreed that petitioner "has always been a professional association as defined by Title 54 of the Code of Virginia." The parties also stipulated that petitioner's amended articles of association (referred to herein as the Articles) were "in effect" during the years in issue. We therefore have found that petitioner was governed by the provisions of the Virginia Act, as well as by the Articles, during the taxable years in issue.
16. There are apparently no recorded legislative committee reports dealing with the Virginia Act. See Comment, "Limited Liability for Shareholders in Virginia Professional Corporations: Fact or Fiction?," 21 U. Richmond L. Rev. 571, 576 n.34 (1987)↩ (noting that the Virginia General Assembly does not record its legislative history).
17. Section 301.7701-2(b)(3)↩, Proced. and Admin. Regs.
18. In O'Neill v. United States, 410 F.2d 888 (6th Cir. 1969), the Government argued that an entity organized under the Ohio Professional Association law lacked continuity of life because shares in such organization were required to be owned by persons licensed to practice the profession, and one of the shareholders might become disqualified at a time when the corporation could not redeem the shares and no one was willing to buy them. The Sixth Circuit rejected the Government's argument that the existence of such contingency would defeat continuity of life, stating: It is not clear under Ohio law what the result would be were such a situation to exist. However, the fact that there might be a condition which would require the forfeiture of corporate status does not change the legal situation: Ohio has granted to such corporations continuity of existence. 410 F.2d at 899↩.
19. Petitioner's argument on brief that "all" Owner-Physicians had to approve any purchase in excess of $ 1,000 as well as endorsing any check of $ 1,000 or more is not supported by the accompanying citation to the transcript. More specifically, the cited testimony (by Dr. Khuri) states that the Board of Directors had the authority to approve payments and that, for any payment above $ 1,000, two of petitioner's members would have to sign the checks. Dr. McVey testified consistently that the signatures of only two↩ associates were required for checks. The Bylaws provided that, generally, "all checks must be signed by the Executive Secretary, President, and Vice-President of the Governing Body." Petitioner's Executive Secretary was Mrs. Jean Addison, who was not an associate of petitioner.
20. The following exchange took place on direct examination of Dr. Khuri: Q: All right. Let's focus a moment on the operation of the Association. Who ran the Association, that is, Richlands Medical? A: The board of directors. Q: Why do you state that? A: Because I've been a member of the board of directors. I've been the president of the Association. I know how it was run. [Emphasis supplied.]↩
21. Petitioner's Medical Staff Bylaws, which provided rules governing the Hospital's medical staff, similarly defined the Hospital's "Governing Body" as "stockholders of the Richlands Medical Association T/A Mattie Williams Hospital."
22. See also Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, p. 2-6 n.13 (5th Ed. 1987) (noting that "A one-owner organization * * * may encounter difficulties in establishing that it possesses such corporate characteristics as continuity of life and centralized management"); Horsley, "The Virginia Professional Association Act: Relief for the Underprivileged?" 48 Va. L. Rev. 777, 803-804↩ (1962) (suggesting that, under the original version of the Virginia Act, which required a three-person professional association to have only two directors, the death of one associate would cause such association to lose centralized management).
23. Nico v. Commissioner, 67 T.C. 647↩ (1977).
24. We note that Morrissey is cited in section 301.7701-2(c)(2)↩, Proced. and Admin. Regs., which deals with the composition and selection of the management group.
25. Swanson v. Commissioner, 296 U.S. 362 (1935), and Helvering v. Combs, 296 U.S. 365↩ (1935).
26. While we did not focus in Hynes on the issue of whether centralization of management exists if the management group includes all the members of an association, an overly technical reading of the parenthetical language of section 301.7701-2(c)(1)↩, Proced. and Admin. Regs., in that case might have precluded the existence of centralized management because the board of trustees of the trust included the sole beneficiary.
27. In the same paragraph, the Bittker & Eustice treatise notes the regulations' requirement that the managerial group be "composed of less than all the members."↩
28. Section 301.7701-2(d)(1), Proced. and Admin. Regs., specifically notes that contractual agreements under which another person assumes a member's liability or agrees to indemnify the member for such liability are insufficient to create↩ limited liability if under local law the member remains liable to his creditor.
29. See Kurzner v. United States, 286 F. Supp. 839, 842 (S.D. Fla. 1968). In 1967, the provision was amended by the addition of the following sentence: the personal liability of shareholders of a corporation organized under this act, in their capacity as shareholders of such corporation, shall be no greater in any aspect than that of a shareholder-employee of a corporation organized under [the general corporation laws]. [Kurzner v. Commissioner, 413 F.2d 97, 107 (5th Cir. 1969), citing Fla. Stat. section 621.07 (1967).] Such amendment was not retroactive, and the Government argued that a Florida court might construe the original provision at issue in Kurzner to impose virtually unlimited liability on shareholder-professionals. The Fifth Circuit, however, characterized the amendment as a "clarification" and declined what it referred to as the Government's "invitation to speculate." 413 F.2d at 107-108↩ n. 52.
30. The FloridaAct, unlike the Virginia Act, had a provision rendering Florida's general corporation laws applicable in all instances not covered specifically by the professional corporation law. The District Court (whose decision was affirmed by the Fifth Circuit) had cited such provision as "sharply limiting" the liability of the shareholder-professionals. Kurzner v. United States, 286 F. Supp. 839, 845 (S.D. Fla 1968). In the instant case, section 54-892 itself provides that associates shall not, by reason of being associates↩, be liable for claims against the association, other associates, or employees of the association.
31. Because the professional corporation qualified as a corporation under the Kintner Regulations, the court found it unnecessary to decide the validity of such regulations. Kurzner v. Commissioner, 413 F.2d 97, 112↩ (5th Cir. 1969).
32. The OhioAct's savings clause provided that: [The provisions of the OhioAct] do not modify any law applicable to the relationship between a person furnishing professional service and a person receiving such service, including liability arising out of such professional service. [O'Neill v. United States, 410 F.2d 888, 900↩ (6th Cir. 1969).]
33. The portion of the O'Neill opinion discussed in the instant case may be regarded as dicta in that case, as the Sixth Circuit's holding in O'Neill was that a "corporation" under state law is to be treated as a corporation for Federal income tax purposes without regard to any test of corporate "resemblance." In that regard, the Court reasoned that section 7701(a)(3) does not define "corporation," but extends corporate status to organizations which otherwise would not fall within the meaning of the term. O'Neill v. United States, 410 F.2d 888, 895, 899 (6th Cir. 1969). We need not address that issue in the instant case, as petitioner was an unincorporated↩ entity under the Virginia Act.
34. While the Court of Appeals affirmed the Appellate Division decision quoted herein and did not explicitly disagree with any portion of the Appellate Division's analysis, the Court of Appeals in one portion of its opinion characterized section 1505 of New York's Business Corporation Law as warranting strict construction in that it "carves out a limited exception to a rule of broad and general application and imposes liability unknown at common law." 490 N.Y.S. 2d at 745. That language appears contrary to the quoted statement of the Appellate Divisionand to our analysis in the instant case.
35. Nelson v. Patrick, 58 N.C. App. 546, 326 S.E. 2d 45, 50↩ (1985) (citing section 55B-9 of North Carolina Professional Corporation Act).
36. In a Comment entitled "Limited Liability for Shareholders in Virginia Professional Corporations: Fact or Fiction?," 21 U. Rich. L. Rev. 571 (1987), the author proposes legislative change to the Virginia Professional Corporation Act (PC Act) to avoid the possibility of such judicial construction of the PC Act's savings clause. (The PC Act existed concurrently with the Virginia Act involved in the instant case between 1970 and 1988, at which time the Virginia Act was repealed). The Comment notes that the PC Act does not contain a provision similar to section 54-892 of the Virginia Act, and suggests that a construction of its savings clause as importing vicarious liability would be less likely if such a provision were added to the PC Act. 21 U. Rich. L. Rev. at 586-587↩.
37. The Fifth Circuit has explained the "reasonableness" requirement of section 162(a)(1) as follows: Because the shareholders will receive the profits of the business one way or the other, all parties prefer to characterize payments to shareholders as compensation. For that reason, a corporation may deduct compensation only to the extent that it is reasonable. Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1323 (5th Cir. 1987), affg. T.C. Memo. 1985-267. For a discussion of the legislative history of section 162(a)(1), see Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. 1142, 1155↩ (1980).
*. See footnote 6, supra↩.
38. Petitioner's expert report was prepared by a partner specializing in health care consulting at a nationally known accounting firm. Respondent's expert report was prepared by an executive with a corporation engaged in the preparation of organizational studies including compensation studies. He also taught organizational evaluation in the Masters of Administration program at the University of Maryland and, in a book, wrote a chapter dealing with occupational issues.↩
39. The majority of respondent's expert report consists of tabulations of data aimed at demonstrating that the compensation paid to petitioner's associates was unreasonable. While we found the data relating to changes in associate compensation, patient collections and various income measurements of petitioner useful, many of the charts comparing petitioner with other enterprises were misleading in that they apparently compared the total compensation received by petitioner's associates with amounts paid by other enterprises for executive services only. Useful information may be derived from these charts, however, by subtracting (from the amounts noted therein for petitioner) the amounts which we find to represent reasonable compensation for patient services and medical supervisory positions. See Anselmo v. Commissioner, 80 T.C. 872, 884-885 (1983), affd. 757 F.2d 1208 (11th Cir. 1985). Other charts prepared by respondent's expert are unconvincing in that they present data for enterprises too large or different in function to truly be comparable with petitioner. Petitioner heavily focuses on the fact that respondent's expert compared data relating to taxpayers on the accrual basis with data from petitioner, a cash basis taxpayer. As we have not relied on those comparisons (which primarily deal with compensation as a percentage of sales) in reaching our conclusions herein, we need not address petitioner's arguments about the effect of its accounting method on the data.↩
40. We recognize that, in one of the contracts providing for "100%" of collections, a typed figure of 85 percent was crossed out and changed to 100 percent. We do not attach any significance to such fact, especially in view of the fact that in another contract, a typed figure of "100%" was changed in handwriting to 110 percent.↩
41. We note that the data submitted into evidence with respect to nonowner physicians aggregates the "collections" of several emergency room physicians. We have used aggregate collections and compensation of such emergency room physicians in deriving the number of physicians receiving more than 85 percent of collections.
42. While we may accept the opinion of an expert in its entirety, Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441, 452 (1980), we may be selective in the use of any portion of such an opinion. Parker v. Commissioner, 86 T.C. 547, 562↩ (1986).
43. The amount which we hereby allow as compensation for services to patients is equal to the total amount allowed in respondent's notice of deficiency. Respondent argues on brief that the amounts allowed in his notice of deficiency were made up of two components -- namely, a "patient service" component equal to 85 percent of collections, and an "officer" component equal to 15 percent of collections. We, however, have found that the full amount allowed in the notice of deficiency constitutes reasonable compensation for services to patients. We note Dr. McVey's testimony that the hospital at which he practiced at the time of trial did not bill patients for his services.
44. Petitioner's expert explained at trial why Maryland data was used even though the Hospital was located in Virginia. He stated that, because of the extensive state filing requirements imposed on Maryland hospitals, "every major health care researcher in the country uses Maryland data base for any type of comparisons." He also explained that there is no similar data base for Virginia and noted the proximity of the two states.↩
45. We recognize that the compensation assigned by petitioner's expert to three of the positions in question is under $ 10,000 and suggestive of part-time work.↩
46. Petitioner's expert testified that he did not review each line in petitioner's Medicare cost reports, which were each about 100 pages long, but relied upon "overall Medicare methodology" and net payments for his conclusion. He also testified that associates' compensation for direct patient care services would not be reflected in the Medicare cost reports. The Medicare cost report excerpt submitted in evidence in the instant case does not refer separately to the compensation paid to petitioner's associates.
47. Although respondent's expert report listed Dr. Khuri as president, Dr. Moore as vice president, and Dr. McVey as secretary-treasurer, the record is unclear as to the offices held by Drs. McVey and Moore. Dr. McVey's testimony indicates that he was petitioner's vice president, and, in response to the question about who served as vice president, Dr. Khuri simply responded "One of the other two" (referring to Drs. McVey and Moore). The recorded minutes of petitioner's Board of Directors meetings list Dr. Khuri as president but do not list titles for Drs. McVey or Moore.
48. We are reluctant to agree with the conclusion of respondent's expert that petitioner's associates participated equally↩ in a chief executive role; Dr. Khuri's testimony indicates otherwise. However, as we are determining only the total deduction allowable to petitioner, we find it unnecessary to allocate the compensation between the three associates.
49. We note that petitioner admits on brief that the cost reimbursement methodology upon which it bases its argument also may result in situations where the health care providers must later repay amounts already collected as an interim settlement. Were we to adopt petitioner's argument that its associates should be given "credit" during the years in issue for services performed in prior years, we also would need to allow respondent to adduce evidence to address the logical extension of such argument, namely, that some of the services performed by petitioner's associates during the years in issue should not be compensated until later years.
50. See Petro-Chem Marketing Co. v. United States, 221 Ct. Cl. 211, 602 F.2d 959, 967 (1979) (referring to, but not deciding, the "novel issue" of whether a corporate enterprise whose income is earned solely from the personal services of its officers, should be permitted to pay out all of its income, less amounts retained for working capital, etc. to its officers in the form of compensation); Apolinsky, Tax Planning for Professionals, p. 3-83 (1986) ("Many commentators and practioners believe that a professional corporation should be insulated against unreasonable compensation issues because substantially all of the income generated by the corporation is derived from the efforts of the professionals.") Cf. Eduardo Catalano,Inc. Pension Trust v. Commissioner, T.C. Memo. 1979-183↩.
51. Section 6653(a) provides: (a) NEGLIGENCE OR INTENTIONAL DISREGARD OF RULES AND REGULATIONS WITH RESPECT TO INCOME, GIFT, OR WINDFALL PROFIT TAXES. -- (1) IN GENERAL. -- If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A, by chapter 12 of subtitle B or by chapter 45 (relating to windfall profit tax) is due to negligence or intentional disregard of rules or regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment. (2) ADDITIONAL AMOUNT FOR PORTION ATTRIBUTABLE TO NEGLIGENCE, ETC. -- There shall be added to the tax (in addition to the amount determined under paragraph (1)) an amount equal to 50 percent of the interest payable under section 6601 -- (A) with respect to the portion of the underpayment described in paragraph (1) which is attributable to the negligence or intentional disregard referred to in paragraph (1), and (B) for the period beginning on the last date prescribed by law for payment of such underpayment (determined without regard to any extension) and ending on the date of the assessment of the tax (or, if earlier, the date of the payment of the tax).
52. We note that at trial, petitioner's associates appeared to characterize the equal distributions as "draws" to meet living expenses.↩
53. On cross-examination, Dr. Khuri stated that he had not kept copies of the information given to petitioner's accountants or bookkeepers on how to divide petitioner's profits. On cross-examination, Dr. McVey testified that he did not know whether petitioner filed corporate or partnership returns.↩